**Query**   **Reports**   **Utilities**   **Help**   **What's New**   **Log Out**

BNDAOV

# U.S. District Court
## Southern District of Florida (Ft Lauderdale)
### CRIMINAL DOCKET FOR CASE #: 0:21-mj-06507-AOV-1

Case title: USA v. Chin                                    Date Filed: 09/07/2021

Assigned to: Magistrate Judge Alicia O.
Valle

**Defendant (1)**

**Dr. Kingsley R. Chin**                  represented by   **James Michael Stark**
63644-509                                                  524 S Andrews Avenue
*YOB 1964 English*                                         Suite 304-N
                                                           Fort Lauderdale, FL 33301
                                                           954-522-3307
                                                           Email: jmstarkpa@aol.com
                                                           *ATTORNEY TO BE NOTICED*

**Pending Counts**                                         **Disposition**

None

**Highest Offense Level (Opening)**

None

**Terminated Counts**                                      **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                             **Disposition**

18:U.S.C.§371 CONSPIRACY TO
VIOLATE ANTI-KICKBACK STATUTE;
42:U.S.C.§1320a-7b(b)(1)(B),(b)
(2)(B)VIOLATIONS OF THE ANTI-
KICKBACK STATUTE;
18:U.S.C.§1956(h)CONSPIRACY TO
COMMIT MONEY LAUNDERING

**Plaintiff**

**USA**                              represented by  **William T. Shockley**
United States Attorney's Office
500 East Broward Boulevard, Suite 700
Fort Lauderdale, FL 33394
954-356-7255, ext. 3587
Fax: 954-356-7230
Email: William.T.Shockley@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/07/2021 | 1 | Magistrate Removal of Indictment from DISTRICT OF MASSACHUSETTS Case number in the other District 1:21-CR-10256-RWZ as to Kingsley R. Chin (1). (at) (Entered: 09/07/2021) |
| 09/07/2021 | | Arrest of Kingsley R. Chin (at) (Entered: 09/07/2021) |
| 09/07/2021 | | Set Hearing as to Kingsley R. Chin: Initial Appearance - Rule 5(c)(3)/40 set for 9/8/2021 AT 11:00 AM in Fort Lauderdale Division before FTL Duty Magistrate. (at) (Entered: 09/07/2021) |
| 09/08/2021 | 2 | NOTICE OF TEMPORARY ATTORNEY APPEARANCE: James Michael Stark appearing for Kingsley R. Chin *FOR REMOVAL HEARING ONLY* (Stark, James) (Entered: 09/08/2021) |
| 09/08/2021 | 3 | Minute Order for proceedings held before Magistrate Judge Alicia O. Valle: Initial Appearance in Rule 5(c)(3)/Rule 40 Proceedings as to Kingsley R. Chin held on 9/8/2021. Bond recommendation/set: Kingsley R. Chin (1) $1 MILLION CSB WITH NEBBIA. Deft has one week to post corporate bond. Passport to be surrendered immediately. Daily telephonic contact with pretrial until bond is posted. Defendant verbally waives removal and identity hearings. (Digital 11:47:56) (Signed by Magistrate Judge Alicia O. Valle on 9/8/2021). (at) (Entered: 09/08/2021) |

SDFL Case 21-MJ-6507-AOV

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 21cr10256 |
| v. | Violations: |
| (1) KINGSLEY R. CHIN, | **Count One**: Conspiracy to Violate the Anti-Kickback Statute (18 U.S.C. § 371) |
| (2) ADITYA HUMAD, and | |
| (3) SPINEFRONTIER, INC., | **Counts Two through Seven**: Violations of the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)(2)) |
| Defendants | **Count Eight**: Conspiracy to Commit Money Laundering (18 U.S.C. § 1956(h)) |
| | **Forfeiture Allegations**: (18 U.S.C. §§ 982(a)(1) & 982(a)(7)) |

## INDICTMENT

At times relevant to this Indictment:

### General Allegations

### The Defendants

1.      Defendant Kingsley R. CHIN, MD was a Florida resident, and the founder,

principal owner, President, Chief Executive Officer, and a Director of SPINEFRONTIER, INC.

2.      Defendant Aditya S. HUMAD was a Massachusetts resident, and

SPINEFRONTIER's Chief Financial Officer and Vice President of Business Development.

3.      Defendant SPINEFRONTIER, INC. was a Delaware corporation with a principal

place of business at 350 Main Street, Malden, Massachusetts 02148.   SPINEFRONTIER

1

designed, manufactured, marketed, and sold spinal medical products, including in the District of Massachusetts.   Surgeons used these products in spine surgeries that Federal health care programs paid for throughout the United States.

### Impartial Medical Expert, LLC

4.       Impartial Medical Expert, LLC (IME) was a Delaware corporation that identified its business address as 3296 N. Federal Highway #11631, Fort Lauderdale, Florida, which was a post office box.   Beginning in or around approximately October 2013, IME purported to manage the process pursuant to which SPINEFRONTIER's surgeons submitted hours and received payments from or on behalf of SPINEFRONTIER for purported consulting.   CHIN was the principal owner of IME.

### Co-Conspirator Surgeons & The Co-Conspirator Distributor

5.       Surgeon 1, Dr. Jason Montone, was a spine surgeon who practiced medicine in Missouri and Kansas and used SpineFrontier products in spine surgeries.

6.       Surgeon 2 was a spine surgeon who practiced medicine in Ohio and used SpineFrontier products in spine surgeries.

7.       Surgeon 3 was a spine surgeon who practiced medicine in New York and used SpineFrontier products in spine surgeries.

8.       Surgeon 4 was a neurosurgeon who practiced medicine in Ohio and used SpineFrontier products in spine surgeries.

9.       Surgeon 5 was a spine surgeon who practiced medicine in Illinois and Florida and used SpineFrontier products in spine surgeries.

10. Surgeon 6 was a spine surgeon who practiced medicine in Texas and used SpineFrontier products in spine surgeries.

11. Surgeon 7 was a spine surgeon who practiced medicine in Colorado and used SpineFrontier products in spine surgeries.

12. John Balzer, Distributor 1, was the owner and operator of a distribution company, BIOinnovations LLC, who distributed SPINEFRONTIER products in Kansas and Missouri and worked with Surgeon 1.

### The Medicare and Medicaid Programs

13. Medicare is a federally funded health care program that provides benefits to individuals who are sixty-five years of age or older or disabled. Medicare is subdivided into multiple Parts. Medicare Part A covers health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B covers physician services and outpatient care.

14. The Centers for Medicare and Medicaid Services (CMS), a federal agency under the United States Department of Health and Human Services, administers Medicare. Individuals who qualify for Medicare benefits are commonly referred to as Medicare "beneficiaries."

15. Medicaid is a jointly funded federal and state health care program that provides certain health benefits to the disabled, as well as to individuals and families with low incomes and resources. At the federal level, CMS administers Medicaid. CMS is responsible for overseeing the Medicaid program in participating states, including Massachusetts and Missouri.

3

Individuals who qualify for Medicaid benefits are commonly referred to as Medicaid "beneficiaries."

16.     Medicare and Medicaid are each a "health care benefit program" within the meaning of 18 U.S.C. § 24(b), and each is a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f), the federal Anti-Kickback Statute (AKS).

## TRICARE

17.     TRICARE is a health care program administered by the Defense Health Agency in the Department of Defense.   10 U.S.C. §§ 1071-1110b.   TRICARE provides health care insurance for active-duty military personnel, military retirees, and military dependents.

18.     TRICARE is a "health care benefit program" within the meaning of 18 U.S.C. § 24(b) and is a "Federal health care program" as defined by the AKS.

## Veterans Health Administration

19.     The Veterans Health Administration (VHA) is a health care program administered by the Department of Veterans Affairs.   38 U.S.C. §§ 1701-1788.   VHA provides health care for veterans and certain family members.

20.     VHA is a "health care benefit program" within the meaning of 18 U.S.C. § 24(b) and is a "Federal health care program" for purposes of the AKS.

## The Sunshine Act

21.     As of March 31, 2013, the Physician Payments Sunshine Act, 42 U.S.C. § 1320a-7h(a)(1)(A), required medical product manufacturers, such as SPINEFRONTIER, to disclose to CMS any payment or transfer of value made to a physician, including surgeons, or a hospital, as

well as any physician ownership or investment in the covered manufacturer.

### Background on Spine Surgeries and Their Reimbursement

22.     Often, there were two types of payments and reimbursements associated with spine surgeries: one for the costs of the surgical procedure, and the other for the skilled labor provided by the surgeon.

23.     Hospitals and surgical centers where surgeons perform spine surgeries typically submitted a bill to a patient and a claim for reimbursement to an insurance carrier, including Federal health care programs, for the costs associated with a surgery, including the costs of spinal products used during procedures.

24.     Surgeons typically submitted, or caused to be submitted, a separate bill to patients and a claim to an insurance carrier, including Federal health care programs, for the surgeons' services rendered during the surgical procedure.

25.     Spinal implant devices such as screws, rods, cages, and plates were often kept in trays or kits that were held on a consignment basis at a hospital or surgical center.   The costs of spinal implants could be significant.   The prices of SPINEFRONTIER's products varied, ranging from hundreds to thousands of dollars.

26.     When a surgeon selected and used a specific spinal implant in a surgery, the hospital or surgical center ordered a replenishment implant and paid the implant manufacturer for the implant used in the procedure.   Often, a hospital or surgical center sent replenishment orders to an implant manufacturer like SPINEFRONTIER on a surgery-by-surgery basis so that the kits or trays from which the surgeon used the implant are complete and ready to be used in a

5

future surgery.

## **Object and Purpose of the Conspiracy**

27.     The object of the conspiracy was to pay bribes in connection with the use of

SPINEFRONTIER products in health care services reimbursed in whole or in part by Federal

health care programs, including Medicare, Medicaid, TRICARE, and VHA.

28.     The purpose of the conspiracy was for CHIN, HUMAD, SPINEFRONTIER, and

their co-conspirators, known and unknown to the Grand Jury, to enrich themselves.

## **Overview of the Conspiracy**

29.     Between in or about late 2012 and at least in or about June 2019, CHIN,

HUMAD, SPINEFRONTIER, and their co-conspirators paid and directed the payment of

millions of dollars in bribes to surgeons, including Surgeons 1-7, pursuant to a sham consulting

program that paid those surgeons between approximately $250 and $1,000 for each hour the

surgeon supposedly spent performing consulting services.

30.     Surgeons 1-7 participated in SPINEFRONTIER's sham consulting program by

accepting payments for purported consulting work they did not in fact perform.   Rather, they

accepted these sham consulting payments as a bribe and reward for their continued selection and

usage of SPINEFRONTIER products.

31.     During the course of the conspiracy, CHIN, HUMAD, and SPINEFRONTIER

conspired to pay significant amounts of money in sham consulting payments, including millions

of dollars in sham payments to Surgeons 1-7, in exchange for their using SPINEFRONTIER

products.

32. Although SPINEFRONTIER's surgeon-consulting program was purportedly directed at gathering from surgeons technical feedback about SPINEFRONTIER's products, CHIN and HUMAD in fact designed and used the program, and the bribes they paid to surgeons, as a vehicle to induce those surgeons to order and use SPINEFRONTIER's products, and to reward their selection and use of SPINEFRONTIER's products, in surgeries paid for entirely or in part by health care benefit programs, including Federal health care programs such as Medicare, Medicaid, TRICARE, and VHA.

33. During the course of the conspiracy, CHIN, HUMAD, SPINEFRONTIER, and their co-conspirators paid surgeons as if the surgeons had spent hundreds of hours evaluating products, discussing industry trends, and educating medical residents, when they had not.

34. In fact, multiple surgeons, including Surgeons 1-7, frequently spent only a small fraction of their reported time, if any at all, performing actual consulting activities for SPINEFRONTIER. Instead, on numerous occasions, HUMAD determined the amount of bribes SPINEFRONTIER would pay surgeons by reviewing how many surgeries the surgeons performed using SPINEFRONTIER's products and how much revenue those surgeries generated for SPINEFRONTIER.

35.     During the course of the conspiracy, CHIN, HUMAD, SPINEFRONTIER and their co-conspirators paid, at least, the following bribe amounts:

| Surgeon | Approximate Amount Paid |
|---------|------------------------|
| Surgeon 1 | $379,719 |
| Surgeon 2 | $255,025 |
| Surgeon 3 | $125,288 |
| Surgeon 4 | $61,037 |
| Surgeon 5 | $35,625 |
| Surgeon 6 | $911,938 |
| Surgeon 7 | $978,831 |
| **Total:** | **$2,747,463** |

36.     SPINEFRONTIER received millions in net revenue from the sales of its products used by Surgeons 1-7.

### Manner and Means of the Conspiracy

37.     Among the manner and means by which CHIN, HUMAD, SPINEFRONTIER, and co-conspirators known and unknown to the Grand Jury carried out the conspiracy were the following:

a.      Paying surgeons, including Surgeons 1-7, to serve as sham consultants;

b.      Paying surgeons, including Surgeons 1-7, to use SPINEFRONTIER products in services provided to patients reimbursed in whole or in part by Federal health care programs, including Medicare, Medicaid, TRICARE, and VHA;

c.      Holding out IME as a separate and independent entity from SPINEFRONTIER, despite the fact that IME was not independent and was in fact owned and controlled by CHIN and operated by HUMAD and others, in part to evade Sunshine

8

Act reporting obligations;

      d.     Using IME as a vehicle to funnel bribe payments to surgeons, including Surgeons 1-7, and to conceal the true nature of the relationship between SPINEFRONTIER and those surgeons;

      e.     Directing surgeons, including Surgeons 1-7, to bill SPINEFRONTIER, via IME, for purported consulting hours based not on time spent consulting, but on the number and type of surgeries the surgeon performed, including surgeries paid for by Federal health care programs;

      f.     Selecting surgeons, including Surgeons 1-7, to participate in the SPINEFRONTIER consulting program based not on their background, qualifications, education, and experience, but instead on their ability and willingness to use SPINEFRONTIER's products in their surgeries, including surgeries paid for in whole or in party by Federal health care programs;

      g.     Adjusting the amount of the bribe based upon the type of procedure performed by the surgeons, including Surgeons 1-7;

      h.     Adjusting the amount of the bribe based upon the number of procedures performed by the surgeons, including Surgeons 1-7;

      i.     Paying surgeons, including Surgeons 1-7, for reported consulting hours despite the sham nature of those reported hours;

      j.     Creating records and documents, including purportedly legitimate contracts, designed to make the sham consulting program appear legitimate;

k.    Misrepresenting, concealing, and hiding acts performed in furtherance of the conspiracy.

## Overt Acts in Furtherance of the Conspiracy

38.    From in or about 2012 through at least in or about June 2019, CHIN, HUMAD, SPINEFRONTIER, and co-conspirators known and unknown to the Grand Jury committed and caused to be committed the following overt acts, among others, in furtherance of the conspiracy:

a.    Chin informed Surgeon 1 that the more products Surgeon 1 used across different SPINEFRONTIER product lines, the better Surgeon 1's financial opportunities would be.

b.    On or about March 11, 2013, HUMAD sent an email to Surgeon 1, copied to CHIN, and attached a Clinical Advisor / Consulting Agreement that stated Surgeon 1 could bill SPINEFRONTIER up to 600 hours and $300,000 annually based on Surgeon 1's "increased interest and availability for feedback on several" SPINEFRONTIER products. CHIN responded to HUMAD: "Thxs."

c.    CHIN and HUMAD each told Surgeon 2 that, pursuant to his agreement with IME, he was to log his hours as one hour for each cervical surgery, and two hours for each lumbar surgery in the online portal administered by IME. CHIN and HUMAD explained to Surgeon 2 that he was "evaluating" SPINEFRONTIER's products by using them in surgery, notwithstanding that Surgeon 2's written contract with IME expressly stated that he would not be paid for hours spent performing surgery.

      d.      HUMAD told Surgeon 3 that SPINEFRONTIER would approve more of Surgeon 3's submitted consulting hours if he used more expensive SPINEFRONTIER products.

      e.      HUMAD told Surgeon 4 that he could submit one to one and a half hours for every cervical construct evaluation and two hours for every lumbar construct evaluation. HUMAD told Surgeon 4 that SPINEFRONTIER would pay him each time he used SPINEFRONTIER's products: one amount for cervical products, and another amount for lumbar products.

      f.      HUMAD had a conversation with Surgeon 4 in which HUMAD informed Surgeon 4 that if Surgeon 4 used more of SPINEFRONTIER's products, then SPINEFRONTIER could pay him more money.

      g.      On or about September 13, 2015, CHIN emailed HUMAD and others and stated, in part, "I want to show this to the CAB [Clinical Advisory Board] to them [sic] hear what they think about us setting these targets for them to hit and show how each target number could translate into IME monthly consulting fees as a reward."   In that same email, CHIN also stated "[e]ach surgeon has the ability to find us at least $25K per week that is better than trying to raise money."

      h.      On or about September 14, 2015, HUMAD forwarded CHIN's email to an employee and directed her to compile the information requested in CHIN's September 13, 2015 email.   HUMAD stated, "Pls see me in my office first thing this morning to discuss the report below if any questions – need done by noon[.]"

     i.     HUMAD had a conversation with Surgeon 5 in which HUMAD informed Surgeon 5 that SPINEFRONTIER would compensate him based on the number and type of surgeries Surgeon 5 performed with SPINEFRONTIER's products.  At no time did HUMAD, CHIN, or anyone else from SPINEFRRONTIER ask Surgeon 5 how much time he had spent consulting.

     j.     By at least on or about the following dates, Surgeons 1-7 entered into sham consulting agreements with SPINEFRONTIER, through IME, in addition to other pre-existing sham direct consulting agreements with SPINEFRONTIER:

| Overt Act | Surgeon | Date of IME Written Contract |
|---|---|---|
| k. | Surgeon 1 | December 1, 2013 |
| l. | Surgeon 2 | Late 2013 (contract undated) |
| m. | Surgeon 3 | February 27, 2013 |
| n. | Surgeon 4 | June 1, 2014 |
| o. | Surgeon 5 | October 17, 2013 |
| p. | Surgeon 6 | April 20, 2014 |
| q. | Surgeon 7 | April 1, 2014 |

     r.     On or about the following dates, among others, the surgeon listed below submitted, or caused to be submitted, a request for payment to SPINEFRONTIER, directly and through IME, for consulting hours purportedly worked.   As a result, CHIN, HUMAD and SPINEFRONTIER, directly and through IME, paid or caused to be paid bribes to the surgeons, and during the same period, the surgeons performed a procedure reimbursed in whole or in part by a Federal health care program:

| Overt Act | Surgeon | Service Period | Request for Payment | Federal Health Care Program |
|---|---|---|---|---|
| s. | Surgeon 1 | May 1, 2013 – June 15, 2013 | June 15, 2013 | Medicare |
| t. | Surgeon 2 | June 1, 2015 – June 30, 2015 | July 7, 2015 | Medicare |
| u. | Surgeon 3 | March 1, 2016 – March 31, 2016 | April 7, 2016 | VHA |
| v. | Surgeon 4 | June 1, 2015 – June 30, 2015 | July 1, 2015 | Medicare |
| w. | Surgeon 5 | October 1, 2015 – October 31, 2015 | November 24, 2015 | Medicare |
| x. | Surgeon 6 | December 1, 2018 – December 31, 2018 | January 1, 2019 | Medicare |
| y. | Surgeon 7 | April 1, 2016 – April 30, 2016 | May 3, 2016 | Medicare |

<u>COUNT ONE</u>
Conspiracy to Violate the Anti-Kickback Statute
(18 U.S.C. § 371)

The Grand Jury charges:

39.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-38 of this

Indictment.

40.    Between at least in or about late 2012 and at least in or about June 2019, in the

District of Massachusetts and elsewhere, the defendants

(1) KINGSLEY R. CHIN,
(2) ADITYA HUMAD, and
(3) SPINEFRONTIER, INC.,

conspired with each other and with others known and unknown to the Grand Jury to commit an

offense against the United States, to wit, violation of the Anti-Kickback Statute, 42 U.S.C.

§§ 1320a-7b(b)(2), that is, to knowingly and willfully offer and pay remuneration, directly and

indirectly, overtly and covertly, in cash or in kind, that is, bribes, to induce the purchase of, lease

of, order of, arranging for use of, or recommendation of goods, services, and items, namely,

SPINEFRONTIER spinal implants and products, for which payment may be made in whole or in

part by a Federal health care program.

All in violation of Title 18, United States Code, Section 371.

14

<u>COUNTS TWO—SEVEN</u>
Violations of the Anti-Kickback Statute
(42 U.S.C. §§ 1320a-7b(b)(1)(B), (b)(2)(B))

41.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-38 of this

Indictment.

42.     Between approximately in or about late 2012 and at least in or about June 2019, in

the District of Massachusetts and elsewhere, the defendants,

> (1) KINGSLEY R. CHIN,
> (2) ADITYA HUMAD, and
> (3) SPINEFRONTIER, INC.,

did knowingly and willfully offer and pay remuneration to each Surgeon listed in the table below,

directly and indirectly, overtly and covertly, in cash and in kind, that is, bribes, to induce the

purchase of, lease of, order of, and arranging for use of, and recommendation of goods, services

and items, namely, SPINEFRONTIER spinal implants and products, for which payment may be

made in whole or in part by a Federal health care program.

| Count | Surgeon | Payments |
|-------|---------|----------|
| 2 | Surgeon 1 | Defendants offered and paid Surgeon 1 bribes totaling approximately $379,719, including a payment of $14,250 on or about September 4, 2015. |
| 3 | Surgeon 3 | Defendants offered and paid Surgeon 3 bribes totaling approximately $125,288, including a payment of $2,375 on or about March 13, 2017. |
| 4 | Surgeon 4 | Defendants offered and paid Surgeon 4 bribes totaling approximately $61,037, including a payment of $2,850 in or about October 2015. |
| 5 | Surgeon 5 | Defendants offered and paid Surgeon 5 bribes totaling approximately $35,625, including a payment of $4,750 on or about January 19, 2016. |

15

| Count | Surgeon | Payments |
|:-----:|:-------:|----------|
| 6 | Surgeon 6 | Defendants offered and paid Surgeon 6 bribes totaling approximately $911,938, including a payment of $40,000 on or about April 30, 2019. |
| 7 | Surgeon 7 | Defendants offered and paid Surgeon 7 bribes totaling approximately $978,831, including a payment of $21,375 on or about July 6, 2018 and $40,000 on or about April 30, 2019. |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B).

<u>COUNT EIGHT</u>
Conspiracy to Commit Money Laundering
(18 U.S.C. § 1956(h))

43.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-38 of this

Indictment.

44.     From approximately in or about September 2013 until at least in or about June 2019,

in the District of Massachusetts and elsewhere, the defendants,

(1) KINGSLEY R. CHIN,
(2) ADITYA HUMAD, and
(3) SPINEFRONTIER, INC.,

conspired with each other and with others known and unknown to the Grand Jury to conduct and

attempt to conduct financial transactions, to wit, transferring and causing to be transferred, funds

to a corporation, Impartial Medical Expert, LLC, to pay, directly and indirectly, illegal bribes to

surgeon physicians, knowing that the property involved in such transactions represented the

proceeds of some form of unlawful activity, and which in fact involved the proceeds of specified

unlawful activity, that is, payment of remuneration, directly and indirectly, overtly and covertly,

in cash and in kind, that is, bribes, in violation of Title 42, United States Code, Section 1320a-

7b(b)(2)(B), and knowing that the transactions were designed, in whole and in part, to conceal and

disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful

activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

All in violation of Title 18, United States Code, Section 1956(h).

17

## KICKBACK AND KICKBACK CONSPIRACY FORFEITURE ALLEGATIONS
(18 U.S.C. § 982(a)(7))

45.     Upon conviction of one or more of the offenses set forth in Counts One through Seven, the defendants,

> (1) KINGSLEY R. CHIN,
> (2) ADITYA HUMAD, and
> (3) SPINEFRONTIER, INC.,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to the offense.

46.     If any of the property described in Paragraph 45, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(7), as a result of any act or omission of the defendants—

> a.  cannot be located upon the exercise of due diligence;
>
> b.  has been transferred or sold to, or deposited with, a third party;
>
> c.  has been placed beyond the jurisdiction of the Court;
>
> d.  has been substantially diminished in value; or
>
> e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 45 above.

All pursuant to Title 18, United States Code, Section 982(a)(7).

18

## MONEY LAUNDERING FORFEITURE ALLEGATION
### (18 U.S.C. § 982(a)(1))

47.     Upon conviction of the offense set forth in Count Eight, the defendants,

(1)     KINGSLEY R. CHIN,
(2)     ADITYA HUMAD, and
(3)     SPINEFRONTIER, INC.,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1),

any property, real or personal, involved in such offense, and any property traceable to such

property.

48.     If any of the property described in Paragraph 47, above, as being forfeitable

pursuant to Title 18, United States Code, Section 982(a)(1), as a result of any act or omission of

the defendants—

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the Court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without
    difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendants up to the value of the property described in Paragraph 47 above.

All pursuant to Title 18, United States Code, Section 982(a)(1).

19

PATRICK M. CALLAHAN
DAVID J. DERUSHA
ABRAHAM R. GEORGE
DAVID G. LAZARUS
Assistant United States Attorneys

DISTRICT OF MASSACHUSETTS, August 30, 2021.

A TRUE BILL

FOREPERSON

District of Massachusetts: AUGUST 30, 2021
Returned into the District Court by the Grand Jurors and filed.

/s/ Dawn M. King 4:22pm
DEPUTY CLERK

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.  21-mj-06507-AOV

UNITED STATES OF AMERICA,

      Plaintiff,

v.

DR. KINGSLEY R. CHIN,

      Defendant.

_____/

### NOTICE OF TEMPORARY ATTORNEY APPEARANCE
### FOR DEFENDANT FOR REMOVAL HEARING ONLY

**TO THE CLERK OF THE ABOVE COURT:**

      **COMES NOW,** James M. Stark, Esq. of **the Law Offices of JAMES M. STARK,  P.A.** and files this Notice of Temporary Attorney Appearance for Defendant, **DR. KINGSLEY R. CHIN,** for Removal Hearing Only in the instant cause.

### CERTIFICATE OF SERVICE

      **I HEREBY CERTIFY** that a copy of the foregoing has been electronically filed via the **CM/EFC** system this **8th** day of **September, 2021,** with the Clerk of the United States District Court, Southern District of Florida; and, **WILLIAM T. SHOCKLEY,**  Assistant United States  Attorney, Office of the United States Attorney, 500 East Broward Boulevard, Suite 700, Fort Lauderdale, FL 33301 via william.t.shockley@usdoj.gov.

                        Respectfully submitted,

                        JAMES M. STARK, P.A.
                        Counsel for Removal Hearing Only
                        600 South Andrews Avenue, Suite 500
                        Fort Lauderdale, FL 33301
                        954-522-3307; 954-768-0738 (Fax)
                        jmstarkpa@aol.com

              BY: _/s/ James M. Stark_____
                        JAMES M. STARK, Esq.
                        Florida Bar No. 169712

# COURT MINUTES/ORDER

## United States Magistrate Judge Alicia O. Valle

**Courtroom 310**                              Date: 9/8/2021    Time: 11:00 a.m.

Defendant: Kingsley Chin(J)        J#: _____    Case #: 21-6507-AOV

AUSA: William Shockey        Attorney: Jim Stark ; Brad Bailey, ESQ
(Local)                    (from District of MA)

Violation: Conspiracy to Violate the Anti-Kickback Statue; Conspiracy to Commit Money Laundering

Proceeding: Initial Appearance-Rule 40/5 Removal        CJA Appt: _____

Bond/PTD Held: ☐ Yes  ☒ No    Recommended Bond: $1 Million CSB

Bond Set at: $ 1 million CSB with Nebbia    Co-signed by: _____

☒ Surrender and/or do not obtain passports/travel docs

Language: English

☒ Report to PTS as _directed_/or _____ x's a week/month by
phone: _____ x's a week/month in person

☐ Random urine testing by Pretrial Services
   Treatment as deemed necessary

☐ Refrain from excessive use of alcohol

☐ Participate in mental health assessment & treatment

☐ Maintain or seek full-time employment/education

☒ No contact with victims/witnesses/co-defts

☒ No firearms

☒ Not to encumber property

☒ May not visit transportation establishments

☒ Home Confinement/Electronic Monitoring and/or GPS
   Curfew 10 pm to 6 am, paid by debt

☐ Allowances: Medical needs, court appearances, attorney visits,
   religious, employment

☒ Travel extended to: State of Florida, District of MA - Defendant verbally

☒ Other: No international travel

Disposition:
Defendant present via VTC
and verbally consents to
proceed via video conference.
Deft advised of rights
and charges.

*Debt has 1 week to
post corporate bond.
- Passport to be surrendered
immediately.
- Daily telephonic contact
with pretrial until bond
is posted
waives Removal & Identity Hearing

| NEXT COURT APPEARANCE | Date: | Time: | Judge: | Place: |
|---|---|---|---|---|
| Report RE Counsel: | | | | |
| PTD/Bond Hearing: | | | | |
| Prelim/Arraign or Removal: | | | | |
| Status Conference RE: | | | | |

D.A.R. 11:47:56                    Time in Court: 30 mins.

CHECK IF APPLICABLE: _____ For the reasons stated by counsel for the Defendant and finding that the ends of justice served by
granting the ore tenus motion for continuance to hire counsel outweigh the best interests of the public & the Defendant in a
Speedy Trial, the Court finds that the period of time from today, through and including _____, shall be deemed
excludable in accordance with the provisions of the Speedy Trial Act, l8 USC 3161 et seq..