<pre>
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS
 2

 3
                                         )
 4   UNITED STATES OF AMERICA,           )
                                         )
 5           Plaintiff,                  )
                                         )   Criminal Action
 6   v.                                  )   No. 1:21-cr-10256-IT
                                         )   Pages 1 to 68
 7   KINGSLEY R. CHIN, ADITYA HUMAD,     )
     and SPINEFRONTIER, INC.,            )
 8                                       )
             Defendants.                 )
 9                                       )

10

11               BEFORE THE HONORABLE M. PAGE KELLEY
                    UNITED STATES MAGISTRATE JUDGE
12

13                    FINAL STATUS CONFERENCE
                        (Digital Recording)
14

15                    September 13, 2023

16

17           John J. Moakley United States Courthouse
                      One Courthouse Way
18              Boston, Massachusetts 02210

19

20

21

22               Linda Walsh, RPR, CRR
                   Official Court Reporter
23       John J. Moakley United States Courthouse
                      One Courthouse Way
24              Boston, Massachusetts 02210
                   lwalshsteno@gmail.com
25
</pre>

```
 1   APPEARANCES:

 2   On Behalf of the Government:
          UNITED STATES ATTORNEY'S OFFICE
 3        By: AUSA David J. Derusha
              AUSA Abraham R. George
 4            AUSA Patrick M. Callahan
              AUSA Christopher R. Looney
 5        One Courthouse Way, Suite 9200
          Boston, Massachusetts 02210
 6        617-748-3100
          david.derusha@usdoj.gov
 7        abraham.george@usdoj.gov
          patrick.callahan@usdoj.gov
 8        christopher.looney@usdoj.gov

 9   On Behalf of the Defendants Kingsley R. Chin and SpineFrontier,
     Inc.:
10        POLLACK SOLOMON DUFFY LLP
          By: Barry S. Pollack, Esq.
11            Joshua L. Solomon, Esq.
          31 St. James Avenue, Suite 940
12        Boston, Massachusetts 02116
          617-439-9800
13        bpollack@psdfirm.com
          jsolomon@psdfirm.com
14
     On Behalf of the Defendant Aditya Humad:
15        FICK & MARX LLP
          By: Daniel N. Marx, Esq.
16            William W. Fick, Esq.
          24 Federal Street, 4th Floor
17        Boston, Massachusetts  02110
          857-321-8360
18        dmarx@fickmarx.com
          wfick@fickmarx.com
19
     On Behalf of the Movant Jason Montone:
20        MICHAEL PABIAN LAW OFFICE, LLC
          By: Michael Pabian, Esq.
21        20 Park Plaza, Suite 1000
          Boston, Massachusetts 02116
22        339-227-0642
          pabianlaw38@gmail.com
23

24            Proceedings recorded by sound recording and
               produced by computer-aided stenography.
25
```

```
 1                    P R O C E E D I N G S
 2           THE COURT:  Okay.  Good afternoon, everyone.
 3           MR. POLLACK:  Good afternoon.
 4           MR. DERUSHA:  Good afternoon.
 5           THE CLERK:  Today is Wednesday, September 13th, 2023.
 6   We are now on the record in criminal case number 21-10256,
 7   United States versus Chin, et al., the Honorable M. Page Kelley
 8   presiding.
 9           Will counsel please identify themselves for the
10   record.
11           MR. DERUSHA:  Good afternoon, Your Honor.  It's AUSA
12   David Derusha for the United States, and with me are AUSAs
13   Patrick Callahan, Chris Looney, and Abe George.
14           THE COURT:  All right.  Good afternoon.
15           MR. POLLACK:  Good afternoon, Your Honor.  Barry
16   Pollack on behalf of Dr. Kingsley Chin and Spinefrontier, Inc.
17   With me -- we're sharing a conference room and hopefully not
18   getting any feedback on this with each other.  We've muted
19   one -- is Josh Solomon.
20           THE COURT:  Okay.  I'm not getting any feedback so
21   far.  And good afternoon to you.
22           MR. FICK:  Good afternoon, Your Honor.  William Fick
23   and Daniel Marx on behalf of defendant Aditya Humad, who is
24   also here on the Zoom.
25           THE COURT:  All right.  Good afternoon.
```

1          MR. PABIAN:  Your Honor, this is Michael Pabian here

2    for intervenor Dr. Jason Montone.

3          THE COURT:  Okay.  Good afternoon to you.

4          MR. PABIAN:  Good afternoon.

5          THE COURT:  Okay.  I think that's everyone, right?

6          All right.  So we're here, first of all, for the final

7    status conference, and I know you've been redirected to Judge

8    Talwani.  And given the outstanding motions, which I'm happy to

9    hear argument on this afternoon, I thought we might continue

10   the final status conference to one last date of Monday, October

11   30th at 10:30 a.m., and I'm happy to hear the parties on the

12   appropriateness of doing that.

13         Okay.  Hearing nothing, I don't know if that means

14   it's not appropriate or appropriate, but anyway, I'm going to

15   put this over to Monday, October 30th, at 10:30 for a -- go

16   ahead.

17         MR. CALLAHAN:  Your Honor, Patrick Callahan for the

18   United States.  Just wondering, is there any chance that that

19   could be in the afternoon?  Only because I have an appearance

20   that morning.  If not, I'm sure my colleagues could handle it,

21   but if it's possible, that would be great.

22         THE COURT:  No problem at all.  And is 2:00 o'clock

23   okay with everyone if we move it to then?  Is that all right

24   with you, sir?

25         MR. CALLAHAN:  That would be great for me, Judge

1    Kelley.  Thank you.

2                THE COURT:  All right.  We'll say 2:00 o'clock.

3                All right.  So -- and I'm going to exclude the time.

4                So we have two motions.  Number 107, which is

5    defendants' motion to compel the government to provide

6    discovery, and then number 108, which is the government's

7    motion to compel.  And I'm happy to start with 107.  And I know

8    that Dr. Montone has asserted his privilege over certain of the

9    emails and other communications with his attorneys on the

10   phone.  And I know you're here, and I accept your assertion of

11   that privilege.  And I don't know, does your lawyer want to be

12   heard any further on that?

13                MR. PABIAN:  Yeah, Your Honor.  I can be brief.  So in

14   short, Dr. Montone decided to seek intervention in this matter

15   last week, upon seeing some of the defendants' briefs which

16   argued that the government could not raise privilege issues

17   here; and essentially what we're doing is we're seeking

18   intervention in the matter and notifying the Court that in the

19   event these documents are held to be within the scope of the

20   discovery or obligations of the government, contrary to the

21   arguments the government has made, that we do intend to assert

22   privilege.  And we believe that the remedy in that situation

23   would be a privilege log, just as Judge Talwani held in the

24   *Gibson* case that the defendants rely heavily on.

25                THE COURT:  Okay.  Thank you very much.  And so I

1    think I'll hear from defendants about the question of the

2    government needing to search Mr. Monotone's phone.

3          MR. POLLACK:  Thank you, Your Honor, I think I'll be

4    taking the lead on this argument.  And I think I'll lead in

5    some of the issues about the motion to intervene rather than

6    try to take that on first because I think some of what gets

7    covered relates to that.

8          But I'll start by referring to *United States versus*

9    *Gibson,* which the party seeking intervention seeks to

10   characterize the holding as a remedy is a privilege log.  It's

11   actually far from that in how that case developed.  And my firm

12   represented the defendant that was seeking the material.

13         I think it's important to remember in that case it was

14   actually a law firm server that was at issue which carried with

15   it, I think largely, material that was irrelevant and would

16   have many third parties claiming privilege who never took any

17   voluntary act.

18         Here we've heard Dr. Montone turns over a phone for

19   imaging, his counsel at the time, who is not counsel present

20   here today, indicates at most the phrase "Please note.  I'm the

21   lawyer with regard to privilege."  It contains no written

22   agreement in response or anything that we've seen in the record

23   that would set parameters or the sort of -- anything remotely

24   like the sort of detailed protocol that appeared in the *Gibson*

25   case to which the government and a law firm had agreed.

1        But I jump to the government's position because it

2   starts even before remedy with the idea that despite holding

3   and controlling the image of the phone, it's not in possession,

4   custody, or control of that phone, and that just runs squarely

5   against what not just Magistrate Judge Cabell had said but also

6   Judge Talwani in that case, who said -- who adopted the

7   Magistrate Judge's finding that holding it and controlling it

8   is possession.  You don't have to reach things like custody

9   or -- but that that was enough to trigger the government's

10  duties.

11       Now, jumping out from that opinion, once that ruling

12  came, there was actually an agreement between the government

13  and the defendant on how that would be searched, and efforts

14  were actually made to craft something that would allow in that,

15  I think, more unique circumstance of a law firm with many, many

16  clients' materials on it on how to handle that.  And the

17  parties holding the privilege still did not have notice at that

18  time.  I don't think notice went out to every client that their

19  materials had been turned over by their law firm to the

20  government.

21       But here, the government, even more so than in *Gibson*,

22  had notice of the *Gibson* ruling.  They should know that when

23  they take possession of items like this, and here they did so

24  without a protocol, at most what they seem to have done -- we

25  have an email from the government that somewhere around August

1     13th they informed Dr. Montone's counsel.  I don't know if that

2     was Mr. Pabian or the underlying counsel who was the conduit of

3     information with the government during Dr. Montone's

4     cooperation.  But they told him that the material had been

5     subject to a motion at that time.  It had been requested for

6     months earlier.

7           We don't know if that was conveyed by the government.

8     Clearly there wasn't any kind of an agreement between the

9     government to convey that information.  As parties often do, if

10    they turn something over to someone else, they let me know so I

11    can object.  This was just handed over to the cooperator saying

12    here, but remember my name, please note, this is my name so

13    that you can avoid privilege material, and again, no agreement.

14    But that means that the intervenor has waited a month.

15          And the law is actually pretty clear.  You don't just

16    assert a privilege by saying I assert privilege or if you

17    require me to, I'll assert privilege.  A party has to make a

18    timely objection and provide a privilege log, and we've

19    provided case law.  I don't think we have a full response to

20    the motion to intervene, but we responded pretty quickly last

21    night.  And we've cited some of the case law in both this

22    circuit and elsewhere that says it's not enough to make a vague

23    reference, particularly whereas here we know that all of the

24    material before -- I don't have the date in front of me, but I

25    think it's in 2018, so late 2018 is what the charge of

1    obstruction runs through.  I think it's December 2018.  I don't

2    know the exact date.

3        But the material that predates that, to the extent

4    there is communications with counsel, it wouldn't be with

5    Mr. Pabian.  We're certainly not looking for communications

6    that have happened in the past few weeks or whatever it may

7    have been with Mr. Pabian.  We are not looking for those things

8    that occurred in the past several months in preparing a

9    response to that request but those things that happened while

10   that -- while Dr. Montone, as he has admitted through pleading

11   guilty, obstructed justice by providing false documents, we

12   believe from what we've read, at least in part, his efforts

13   were using counsel as a conduit.  And I believe the copy was

14   made shortly after that.

15       We're talking about the plea is through December 2018.

16   The copy I think is -- I think there's an email in January

17   saying he was going to be in there sometime in 2019.  So there

18   wouldn't be many materials in the 2019 time frame.  But we're

19   talking about counsel getting used as a conduit.  We cited case

20   law about that.  Obviously information is not privileged when

21   it just reveals facts, not facts for the purpose of legal

22   advice, scheduling information which can be relevant in this

23   case, and I want to get into that as I talk about the *Brady*

24   issues that permeate both of the categories of information that

25   we seek in our motion to compel.

1          But, you know, there's obviously not a blanket claim

2    and a privilege that can be everything that has my lawyer's

3    name in it, which is what it says, "Please note.  Here's my

4    name and email address" is somehow privileged, which cried out,

5    to the extent someone was trying to preserve privilege rights,

6    for a privilege log here, but also a much more diligent effort

7    to preserve the privilege rather than just gain points as a

8    cooperator.

9          And let's face it, that's what's lurking here, right,

10   is that Dr. Montone turned this over to help himself.  He was

11   seeking the affirmative benefit of making this information

12   available without being that nuisance to the government that

13   would insist on privilege through a detailed protocol agreement

14   such as what appeared in *Gibson* where still -- Judge Talwani

15   was not finished.  I want to be clear, that even where it

16   involved numerous other clients who had not yet had notice and

17   had not yet been able to be heard that their information was

18   sitting there.  But anything that didn't make it on a log was

19   getting turned over, and there was supposed to be a Part 2 to

20   that.

21         And certainly the Part 2 here warrants being collapsed

22   into Part 1 because there's been inadequate efforts to maintain

23   the privilege.  And there's so many categories, whether it's

24   the use of the attorneys as the conduit, just facts, the crime

25   fraud exception to the extent that these emails are furthering

1   information to the government, because anything that's about

2   what's getting further to the government would affect the

3   materiality of the obstruction of justice charge that -- to

4   which Dr. Montone has pled guilty, and then scheduling type

5   emails.

6            In addition, the Confrontation Clause, the Supreme

7   Court has found with regard to each privilege, one at a time,

8   that the Confrontation Clause overrides privilege and is

9   important.  So I'd say, Your Honor, if, to the extent there

10  hasn't been a wholesale waiver by a choice, a strategic choice

11  to benefit oneself by handing something over to the government

12  with a note saying "Please note," not reaching an agreement

13  that could protect the material, if that's not deemed a

14  complete waiver, then all of this should be subject to an

15  in-camera inspection.

16           I know we don't know the universe of these documents.

17  I would suspect we're not talking about thousands of documents.

18  We might be talking about dozens.  The government would be in a

19  better position or Mr. Pabian would be in a better position

20  because this is an image, so his client would still have the

21  original phone.  So he should be aware of what he's asserting,

22  which I wouldn't even call a genuine categorical assertion,

23  right?  It's categorical in the everything on the phone.

24           If it turns out you're thinking about turning this

25  over, Your Honor, then I'm going to think about privilege some

1    more.  It's not a categorical that says, hey, there's seven

2    emails with background statements that are purely background

3    that were given for my purposes as attorney.  We're not seeing

4    anything like that that can put this in context, but I do think

5    that at the very least, and there's plenty of case law on this,

6    an in-camera inspection is going to be necessary here in order

7    to determine -- and this might be the time or it might be the

8    time as I address the next category to talk about the scope of

9    *Brady* material because we're talking about a witness who --

10   actually, let me just double-check the date of this.

11          I guess he did enter his plea after the -- after

12   the -- that's it.  The grand jury in this case, in its deep

13   wisdom, carefully considering all the evidence that the

14   government put before it, charged the conspiracy to run through

15   at least June 2019.  And we know that that's just an

16   approximate, right?  Because it's that sort of at least in or

17   about, and I think the "at least" means it could go further

18   with named and unnamed conspirators.

19          As I'm going to get into, Your Honor, the defendants

20   are facing criminal charges about all their activities through

21   that date, and that's several years of the government

22   interacting with named and unnamed conspirators -- alleged

23   co-conspirators and witnesses which brings to the table a

24   number of forms of *Brady* that we expect to see through these

25   materials.

```
1              I think what I can do is sum this up now, and then
2     when I talk about the joint investigation aspect, which is Part
3     2 of our motion, I can apply it to that.  But as --
4              THE COURT:  So, can I just interrupt you for a second?
5     So maybe I'll just ask what -- either the government or the
6     witness, what is the scope of the information the government
7     has, kind of temporally?  How big a -- how much data did the
8     witness hand over to the government?
9              MR. CALLAHAN:  Your Honor, I'll handle this piece
10    unless Mr. Pabian would like to go first.
11             MR. PABIAN:  No, that's fine.  I would just ask for a
12    few brief minutes to respond with some of those arguments that
13    were raised with respect to Dr. Montone.
14             THE COURT:  Okay.
15             MR. PABIAN:  If I could do that afterwards.
16             THE COURT:  Okay.
17             MR. CALLAHAN:  Just to talk about I guess the scope of
18    what was turned over, Your Honor, Dr. Montone -- an extraction
19    and image of his phone was turned over, and the only materials
20    that were held back from that image being turned over were the
21    attorney-to-client communications between Dr. Montone and his
22    criminal defense attorneys at the time.  Again, we're not
23    calling them attorney-client privileged materials.  We're
24    calling them attorney-client communications because we were not
25    given the consent by Dr. Montone to review those.  He
```

1    explicitly carved that out, and he said, I'm giving you these

2    names of my criminal defense attorneys for the ex -- and he

3    says, quote, "For the purposes of protecting any

4    attorney-client privileged text messages or emails on the cell

5    phone."  Those are the only things that we held back, Your

6    Honor.

7          And just to be clear, the only thing we're talking

8    about are one-on-one communications between the attorneys, at

9    the time it was John Kelly and Brian Healy, his two defense

10   attorneys, and Dr. Montone.  And that's one of the reasons -- I

11   just want to make sure we're focused on the right thing, Your

12   Honor.

13         And the volume, I'm not exactly sure what it is

14   because we haven't -- again, we haven't looked at it.  I would

15   suspect it's not in the thousands, exactly like Mr. Pollack has

16   said.  But to put it in context, what we've produced is, and

17   what we produced early, is Dr. Montone's, you know, all the

18   interview reports of Dr. Montone, Dr. Montone's signed plea

19   agreement, his grand jury testimony, the exhibits attendant to

20   his grand jury testimony, and the entire document production.

21         THE COURT:  Okay.  Sure.  So I know you've been really

22   liberal with the discovery, but just focusing for a minute on

23   the information from the phone, what's the time span of the

24   information on the phone?  When does it start and when does it

25   end?

1    MR. CALLAHAN:  I don't have a specific time when it

2    starts, Your Honor.  I know the date it was imaged, which we

3    understand it was early February 2019.

4    THE COURT:  Okay.  And when you say "we've handed over

5    everything except the one-on-one communications with his

6    criminal defense lawyers," does that mean you've given over the

7    entire contents of his phone except for those?

8    MR. CALLAHAN:  Yes, Your Honor.  So it's a Cellebrite

9    report and a forensic report of what's on the phone.  So we

10   turned that over, and we said when we turned it over, Your

11   Honor, and that was June 2022, I believe, we turned it over,

12   and we explicitly called this out to make sure, you know,

13   counsel knew what we were doing and what we felt we could turn

14   over and what was in our possession, and that was everything

15   but those communications that Dr. Montone had explicitly carved

16   out from his consent.

17   You know, going beyond that could have been a Fourth

18   Amendment violation, Your Honor, and also, we're precluded from

19   doing that.  We're precluded from looking at the

20   attorney-client communications, particularly when someone puts

21   us on notice and says in here are my attorney-client

22   communications with my defense counsel.

23   THE COURT:  Sure.  So I understand that you had an

24   agreement with Dr. Montone not to look at those things, but I

25   do think, especially in light of the *Gibson* case, you're kind

1    of treading on very thin ice by taking the whole thing into

2    your possession.  I mean, I wonder if it wouldn't have been

3    simpler for him to give it to you without the attorney-client

4    communications in it.  Because I do think it's kind of a

5    fiction that you don't possess them now, and I think that's

6    what *Gibson* stands for and Judge Talwani endorsed that idea.

7              MR. CALLAHAN:  No, I --

8              THE COURT:  Yeah, so I think they are in your

9    possession.  You agreed not to review them, but I think the way

10   you agreed not to review his attorney-client communications

11   doesn't guarantee that they're all privileged.  I think that's

12   the problem.

13             MR. CALLAHAN:  Right.  No, I understand --

14             THE COURT:  You don't know because you didn't look at

15   them.

16             MR. CALLAHAN:  Right.

17             THE COURT:  So one of the things I would like to know

18   is how many of those communications are there, and if there's

19   not a huge number of them, I will look at them ex parte and see

20   if they contain *Brady* as best I can.  I've done that in other

21   cases, looked at things that -- myself, and I'll get some maybe

22   ex parte communications from the defense concerning what they

23   think would be helpful.

24             I think Attorney Pollack was about to go through those

25   factors, but I'm happy to take a detailed ex parte

1    communication and -- but I don't know if there's -- I mean, I

2    don't -- I don't know how many years of information you have.

3    If it stops in 2019, I don't know when it starts, but I can't

4    imagine he had thousands of communications with his lawyers.

5            MR. CALLAHAN:  I would expect that's correct, Your

6    Honor, and I don't want to waste the Court's time, but if I

7    could have a word about Gibson --

8            THE COURT:  Go right ahead.

9            MR. CALLAHAN:  -- before we move on?  And I

10   understand.  You know, I can take a hint.

11           As to *Gibson*, though, I think it is important to keep

12   a few things in mind about *Gibson* and the holding and what's at

13   issue.  And in *Gibson,* if you look at the transcripts, what

14   they were looking for in *Gibson*, if you look at the transcript

15   of that hearing, Judge Cabell -- and it's docket 75 and it's at

16   page 10.  Judge Cabell is pretty explicit with defense counsel

17   Marty Weinberg, and he says, "Mr. Weinberg, you indicated that

18   you were not interested in any communications between Behman,"

19   who's a witness in that case, someone who the government had

20   met with, as I understand it also someone who had counsel, and

21   what Judge Cabell said was "Mr. Weinberg, you indicated that

22   you were not interested in any communications between Behman

23   and his counsel, and I just happen to note that.  So I've noted

24   here that we would specifically be excluding from any

25   information that would need to be produced those documents

1    involving communications between Behman," who was a witness in

2    that case," and his counsel.  And I think that is an important

3    distinction here, Your Honor.  And again, I'm not going to try

4    to turn you around on *Gibson,* but I also think that makes it

5    very different from what we're having here because the exact

6    thing Judge Cabell is carving out here, the communications

7    between the witness in *Gibson* and his own defense attorney are

8    what we're talking about, and Judge Cabell takes that out of

9    the equation in our view.

10            And I think that's also consistent, Your Honor, with,

11    you know, the decision in *Parnas* where they say how can -- you

12    know, the government with information and documents are in the

13    possession of a filter team, as they describe in *Parnas*.  In

14    *Parnas* was a search warrant.  The returns went back to the

15    government.  They were with the government.  There was a

16    special master, absolutely.  However, it was executed by the

17    government.  It was in the possession of the government, and

18    what the court said was documents that are in possession of the

19    filter team and not accessible to the case team, which is

20    exactly what we're dealing with here, are not subject to the

21    Rule 16 -- are not subject to those Rule 16 discovery

22    obligations, and I think that between the *Parnas* decision, Your

23    Honor, and the difference that we have here between the

24    scenario that -- or not the difference.  You know, the actual,

25    you know, the similarity here in our case where we have

1    Dr. Montone and his criminal defense attorney, those

2    communications aren't carved out, and Judge Cabell himself,

3    with the defense counsel who's arguing this motion, says, I

4    want you to know, we're excluding -- I'm not interested in the

5    communications between the witness and the counsel.  And I just

6    think that -- I think we should take that into account, Your

7    Honor.

8           THE COURT:  Sure.  And I think those are great points,

9    and thank you for raising them.  But, for example, in a

10    situation where you have a tank team looking at something, if

11    they're looking to exclude, say, attorney-client communications

12    but they see one that isn't privileged because there's some

13    other person copied on it or because as, you know, for all

14    these many exceptions that the defense points out in their

15    briefing here, then that would get turned over, right?  The

16    tank team is just pulling out privileged communications.

17           And what I understand the defense to be saying here is

18    you don't know if those emails that you were directed or texts

19    that you were directed not to look at actually are technically

20    all privileged, right?

21           MR. CALLAHAN:  That's correct, Your Honor.

22           THE COURT:  I mean, that's my understanding.

23           MR. CALLAHAN:  No, that's absolutely correct.

24           THE COURT:  And I think they were just wanting you,

25    notwithstanding your agreement with the witness, to go through

1    all those sensitive emails and see are they actually *Brady*.

2    Like, are they not privileged and can be turned over or should

3    be turned over.  So --

4                MR. CALLAHAN:  Just one --

5                THE COURT:  Yes, go ahead.

6                MR. CALLAHAN:  Sorry, Your Honor.  Go ahead.  Just one

7    point about that is, and I think what we saw at the end of

8    *Gibson* and the remedy in *Gibson* was -- very explicitly from

9    Judge Talwani was let the holder of the privilege do that,

10   right?  And if they want to give that back to us, whatever is

11   not privileged, and give that back to the government and say

12   this is not privileged, and then we can review it for, you

13   know, anything, you know, *Brady*, *Giglio*, or any of those local

14   rules, we would of course do that.

15               What we don't want to do is, number one, their

16   consent; number two, a privilege that we don't hold.  And we

17   can't ask them to waive it, Your Honor.  You know, the

18   department explicitly directs us, you may not ask a party for a

19   waiver.

20               THE COURT:  Sure.

21               MR. CALLAHAN:  We're told not to do that, and we

22   didn't do that.  And we were very clear.  I mean, from the

23   beginning we were very clear of what we were going to produce

24   and what we couldn't produce, and it does sound like Mr. Pabian

25   is here to assert that.  I don't know if his attention is to do

1    a privilege log or not do a privilege log, but we will review

2    anything that is deemed not to be privileged.  And I think

3    Mr. Pabian or counsel who is working with Dr. Montone at the

4    time is likely in the best situation to determine what the

5    privilege is because sometimes it follows up, I would imagine,

6    that you're following up on conversations that you've had not

7    over text message or, you know, following a phone call.  And I

8    think it probably takes some coordination between counsel for

9    Dr. Montone and Dr. Montone himself to determine what is

10   privileged.

11           And we agree.  A blanket assertion of privilege, you

12   know, the case law is clear about that.  And I don't think

13   that's -- you know, that's not what we're saying.  We're just

14   saying we can't even access it yet.  They are in a position to

15   do that and make that determination.  We are more than willing

16   to review the material after they take out their

17   attorney-client privileged material that they deem as such and

18   turn it over.

19           THE COURT:  Sure.  Okay.  Okay.  Let me hear from

20   Dr. Montone's lawyer.

21           MR. PABIAN:  Yes, Your Honor.  So on the preliminary

22   point of the government's possession, custody, or control, we

23   agree with the government that these materials are not within

24   its possession for discovery purposes.

25           You know, it bears repeating that Dr. Montone's phone

1    was provided to the government by consent.  There was no

2    warrant or other legal process requiring its production, and

3    that consent was explicitly limited.

4         Now, contrary to the defense argument, that message

5    did not simply say note my name.  It said, and I quote, at

6    docket 110-1, "For purposes of protecting any attorney-client

7    privileged text messages or emails on his cell phone, please

8    note the following phone numbers and email addresses," and it

9    has the information for his two attorneys.  So in those

10   circumstances, Your Honor, it's our position that the Fourth

11   Amendment prohibits a government search from extending beyond

12   those parameters that allowed the government access.

13        THE COURT:  But here's the problem.  You've got

14   Dr. Montone's intentions in handing that over to the government

15   but then you have these conflicting obligations the government

16   has in a criminal case once he becomes a witness and they're in

17   possession of his phone, and I just think his lawyer should

18   have thought of that.  I know it's a bit of a chess game, but I

19   do think when you're working on behalf of a government witness,

20   you're always aware of the fact that everything you say and do

21   is going to get turned over -- I mean, or at least scrutinized

22   to see if it's going to get turned over.

23        So I just think -- I think this doesn't happen very

24   often.  There isn't much in the case law about this because I

25   don't think people do this very often.

1          MR. PABIAN:  Perhaps not, Your Honor.

2          THE COURT:  They give the government something as

3     sensitive as an image of their phone and say please don't look

4     at certain parts of this and don't, you know, think forward to

5     discovery.  So I think that's why we're missing a lot of case

6     law on this.

7          MR. PABIAN:  If I could simply just make two really

8     quick points, understanding the Court's leanings on that issue.

9          THE COURT:  Yes.

10         MR. PABIAN:  The first is, frankly, I think because

11    this was a Fourth Amendment search and limited by consent, the

12    government is not in lawful possession of those messages.  I

13    think the government has told the Court here today that it

14    doesn't believe it has lawful authority to look at those.

15         The second point is with respect to *Gibson*.  You know,

16    the defendants rely on the protocol agreement in that case but

17    neglect to note that that protocol agreement did allow the

18    government to, quote, access the entire server in the event of

19    a subsequent criminal proceeding.  There's no similar

20    permission granted in this case on that point.

21         And then just shifting gears a little bit -- so that's

22    the preliminary issue, right, is whether these are within the

23    scope of discovery.  The secondary issue, if the Court rules

24    against the government on that point, is what's the remedy.

25    And again, we think, just as Judge Talwani held in *Gibson*, it's

1    a privilege log.  And again, as the government noted in its

2    argument, the sole materials we're talking about here,

3    Dr. Montone's communications with his counsel, were off the

4    table from square one in *Gibson*.

5              So I think it's important to be really clear about

6    what the defendants are asking.  They're asking this Court to

7    order the government to review all of Dr. Montone's

8    communications with his criminal defense counsel --

9              THE COURT:  Sure, but I don't think we're going to do

10   that.  I think what would happen is I would ask the government

11   to extract the emails that they deemed not to be in their

12   possession, the ones, you know, that were listed by your

13   client, and see how many of those are there, and then not

14   review them but turn them over either to you for -- to create a

15   privilege log or -- and/or to me to look at them and see if any

16   of them constitute *Brady*.  So you don't happen to know when the

17   communications on the phone began, do you?

18             MR. PABIAN:  I don't, Your Honor.

19             THE COURT:  Okay.

20             MR. PABIAN:  But that's certainly information we can

21   get if we're ordered to do so.  You know, with respect to those

22   two options, without waiving our arguments on the preliminary

23   point, we do think that the appropriate remedy is a privilege

24   log process.  You know, the defendants -- there's a burden that

25   needs to be met for in-camera review, for a party to be

1    entitled to in-camera review.

2          With respect to the crime fraud exception, which the

3    defendants have raised here, there's Supreme Court case law on

4    point, *Zolin*, and that's at 491 U.S. 554.  The defendants don't

5    cite that case.  They don't try to make the type of showing

6    that's required by that case.  And instead, they really fail to

7    articulate any specific basis at all to believe there are

8    material communications.

9          The cases that they've cited on that issue, on the

10   notion that the privilege can be overridden here by defendants'

11   Constitutional rights, are clearly distinguishable.  By and

12   large they involve specific materials that have been identified

13   as highly material to the case.

14         In *Murdoch v. Castro*, it was a letter by the witness

15   to counsel, a specific letter, that exonerated the defendant.

16   You know, we don't have any showing like that here.  And it's

17   our view --

18         THE COURT:  Let me just say, with regard to *Brady*, the

19   government has an obligation just simply to review all the

20   materials in its possession for *Brady,* and I just think this

21   very peculiar fact situation here is they happen to be taking

22   the witness's direction about what they should not look at, and

23   so they have not looked at certain things, accepting that those

24   things are privileged.  We don't really know if they are or

25   not.

1          And I do think the defendants -- *Brady* does not

2     require that you say we happen to know there's a letter in this

3     there exonerating our client.

4          MR. PABIAN:  Yes.

5          THE COURT:  So you know, I just think -- this is a

6     very odd fact situation, and I haven't ever seen anything like

7     this before.  But I do think -- I'm going to go back and look

8     at *Parnas* again, and I'll read the transcript of the other case

9     just to make sure I really do understand the facts there.

10         But at least right now my intention is to say that

11    these materials are in the government's possession, and if they

12    are truly privileged, they should not be turned over.  If

13    it's -- if it's this man asking or receiving legal advice from

14    his lawyer, that's obviously protected.  But if there is *Brady*

15    information in there and it's not privileged, we need to know.

16    So I don't know.

17         Mr. Pollack, do you want to say anything more about

18    this?

19         MR. POLLACK:  I do because I think the *Gibson* case has

20    been mischaracterized a bit by people who weren't a part of it.

21    And I can say that the issue that was before Judge Talwani

22    there -- and I think in ways Mr. Callahan referred to this but

23    spun it in a way -- there wasn't a concern by defendants about

24    getting more than that privilege log there.  Here there is.

25    Here we're looking for specific *Brady* material.  Behman was not

1    the person who turned over his communications.  A law firm
2    turned over its server, right?  It was a different setting.
3           And where the parties were able to guide the remedy,
4    one thing that's certainly not in *Gibson* is Judge Talwani
5    saying, oh, it would be a big error for Magistrate Judge Cabell
6    to have done an in-camera inspection.  That doesn't appear
7    there.  In the right setting, that's the easiest remedy, right?
8    That takes -- that creates the least amount of issues here
9    while safeguarding *Brady* rights.
10          Because what we do know is from what the government
11   has turned over, to the extent we take their representations at
12   face value, it would appear that -- if I can get an exact date,
13   I think -- Dr. Montone's first visit to their office was --
14   actually, I have 2018.  I don't know -- what's that?
15          MR. SOLOMON:  December.
16          MR. POLLACK:  Right.  So we'd expect there would be
17   some advice leading up to that.  We'd expect that there might
18   be a relay, a conduit, as we've cited in the case law, of facts
19   such as the government wants to hear if you'll say this.  It's
20   not legal advice.  That's referring to what the government has
21   said, and I understand why the government might not want us to
22   get that, but that's clear *Brady* material in the category we've
23   cited of unreliability of the government investigation.
24          I really want to remind Your Honor, unlike in *Gibson*
25   here, the grand jury has decided to indict a conspiracy period

1    through at least December -- June 2019, and we have to defend

2    that.  And we have government actors all over the place by then

3    for a couple of years getting their fingers and voice and ears

4    all over people who the grand jury has decided could be actual

5    or potential, named or unnamed, known or unknown

6    coconspirators, and we have to defend against that through

7    the -- not just a very important mens rea defense in terms of

8    all the kinds of things that normally happen, but government

9    actors permeating the events at issue through the charged

10    conspiracy period, which, you know, I think the grand jury has

11    essentially, in some ways, left open the possibility that a

12    jury could find that Dr. Montone was a conspirator through some

13    date in the charged conspiracy.

14          It's important to us to know what the government has

15    influenced at some point, to know if Dr. Montone would not

16    share any possible goals of other people who are allegedly

17    culpable in the action because that could remove one potential

18    co-conspirator, which we're allowed to do as part of our theory

19    of defense.

20          Finally, I'd say with regard to the burden to do an

21    in-camera inspection, the case law is really clear.  It's very

22    light of what it takes for an in-camera inspection because it's

23    not considered intrusive to do an in-camera inspection.  It's

24    considered protective, Your Honor.  And it probably goes

25    without saying we have a lot more faith in Your Honor deciding

1    whether something is privileged or fits within exception or

2    constitutes *Brady* than we would in a tank team doing it

3    somewhere or even Dr. Montone's counsel, who, you know, this is

4    going to slow down this case by months if it goes that way.

5    When I think -- I am taking an educated guess that we're going

6    to see at most dozens of emails, not -- certainly not thousands

7    and not hundreds.  You know, there will be --

8             THE COURT:  Okay.  I'm going to take another look at

9    everything, and then I'll try to make a ruling very shortly,

10   within the next few days, on this, but -- and I'll do something

11   in writing but not a huge long order.  Okay.  So I --

12            MR. CALLAHAN:  Your Honor, could I follow up, and this

13   is just the last point, and if you want to move on, I can skip

14   it.

15            THE COURT:  It's okay.

16            MR. CALLAHAN:  But the only comment I had is I

17   understand the in-camera review and the desire for that, and

18   I've seen that and we see that as a step when people are

19   challenging a privilege log.  It does seem consistent with what

20   the remedy was in *Gibson* that -- that the, you know, the holder

21   of the privilege create a privilege log, gives it to

22   defendants, and then, you know, if there are, if there is

23   follow-up, they are in a position to challenge that and

24   those -- you know, we can -- that can go before the court.

25            There can be an in-camera review here in that

1    instance, but I'm not sure why, just looking even at the case

2    law in the light most favorable to the defendants here, why we

3    would be doing something beyond *Gibson* when I think, what we

4    believe, *Gibson* isn't.  You know, it's unique and distinct for

5    those reasons, and there is another case out there that, you

6    know, goes the other way.

7         THE COURT:  So I do just think that in this case where

8    you have a witness who has a motive to side with the government

9    and help the government, it's a bit different than the

10   privilege holder in *Gibson*.  But anyway, I'll give that some

11   thought, and I appreciate your argument on that.

12        MR. PABIAN:  Your Honor, could I have two sentences on

13   that point, and I apologize, on behalf of Dr. Montone.

14        THE COURT:  Yes.  Go right ahead.

15        MR. PABIAN:  I just want to note that respectfully

16   there is an intrusion on the privilege that's caused by the

17   requirement to turn over privileged documents to a court.

18   That's why there are cases like *Zolin* requiring a specific

19   showing that the defendants haven't addressed here.

20        You know, so with that, we'll rest on our arguments,

21   but we do -- we do prefer the resolution of a privilege log,

22   and we think that's the appropriate resolution.

23        THE COURT:  Okay.  And let -- I'll take a look at the

24   *Zolin* case, but another possibility is that you produce a very

25   descriptive privilege log and then we don't need to have an ex

1    parte -- I mean, we can take it one step at a time and do the

2    privilege log and see if that's sufficient.  I mean, it may be

3    there's very few communications here, and they're very clearly

4    privileged, right?

5              MR. PABIAN:  Yes, I would agree that that's how it

6    should work, is that we would produce a privilege log and the

7    defendants be free to challenge any entries on that privilege

8    log that they see fit.

9              THE COURT:  I will just say, in my somewhat limited

10   experience in looking through materials for exculpatory

11   evidence that fits the *Brady* rubric, it's much better to have

12   some indication from the defendant as to what their theory of

13   the case is and what might help them, like Mr. Pollack's

14   description of the co-conspirators, et cetera, just now.  And I

15   don't think they'd be inclined to provide you with that.  So,

16   you know, that's one consideration here.

17             But it's a little bit strange that we really have no

18   idea what we're talking about because you weren't the lawyer,

19   and I don't think you know what those communications hold.  So

20   let's -- maybe we'll just take it one step at a time like that.

21   But anyway, okay.

22             MR. POLLACK:  Your Honor, just really briefly on that

23   because I think it needs to go directly to the in-camera review

24   not only for the timing of this but that's the only way to

25   comply with *Brady* here.  We know that Judge Talwani has found

1    in a setting like this -- I think the government has to concede

2    that to the extent that Judge Talwani's statement of the law is

3    correct, that this is in their possession, it needs to be

4    reviewed for *Brady*.

5        What we're doing is actually excusing the government

6    from the conflict it created for itself by allowing -- not

7    allowing -- but by having Your Honor allow it to be done by

8    you, and that solves the issue.  You know, I've always wondered

9    tank teams when they do that, they're violating the

10   Massachusetts Rules of Professional Conduct by looking at

11   privileged materials.  But you know what?  The Confrontation

12   Clause, Compulsory Process Clause actually override those types

13   of concerns.

14       So Your Honor's -- I think it's been close to an offer

15   of potential proposal to review what should be a limited number

16   of documents in camera solves the problem -- the dilemma that

17   the government has created by post *Gibson* taking in a phone

18   rather than having it imaged without those, and I guess,

19   indicating it and letting us fight it out the other way.  But I

20   think otherwise it's a *Brady* violation that continues if this

21   isn't reviewed by an appropriate party.  There's just no way

22   that Dr. Montone and his counsel is authorized to make *Brady*

23   determinations but Your Honor is.  I leave it on that, Your

24   Honor.

25       THE COURT:  Okay.  Let me just say one thing, which

1    is, I'm going to ask the government to somehow figure out how

2    many communications we are talking about and to email counsel

3    and Mr. Vieira with that information when you can get it.  And

4    that would be helpful if I could have that maybe in the next 48

5    hours or so.  I won't hold you firmly to that, but if you can

6    just figure out what is the universe of material that we're

7    talking about.

8             MR. CALLAHAN:  Absolutely.

9             THE COURT:  Thank you.  Okay.

10            So number 2, interactions between the criminal and

11   civil team.  So I really think you have an uphill battle on

12   this one, Mr. Pollack.

13            MR. POLLACK:  It is, but I bring up the -- I think now

14   is the time when I can give the other several categories of

15   *Brady* material, and this flows from what I've already raised

16   about the fact that part of the charged conduct involves a time

17   period when the government was interacting with -- I think Your

18   Honor probably has enough of the background -- you know,

19   surgeons who were parties to consulting agreements, many of

20   whom had their own lawyers, at least as of the time of

21   contracting.

22            THE COURT:  So let me just say, you want all the

23   communications between the civil and criminal teams about these

24   surgeons, but the government is representing that it has looked

25   through everything for *Brady* and there is none.  So -- yeah.

1          MR. POLLACK:  I've heard that sentence once or twice

2     or 40 times before that we know what *Brady* is and we've done it

3     and taken care of.  I think what Your Honor is referring to is

4     on page 14 of their opposition where they call the request moot

5     because they've done the functional equivalent of what we're

6     asking for.  We disagree.  And in part that's because I think

7     there's been -- there had to have been under the circumstances

8     of what we've seen in discovery a gross underestimate of what

9     constitutes *Brady* material in a case like this, which has all

10    of the usual mens rea issues.

11         So obviously anything that would indicate Dr. Chin or

12    anyone at the company, to the extent the company is charged,

13    acted believing what they were doing was genuine, I think the

14    government would say it's aware of that.  And I think the

15    government would say it's looked through what it's looked

16    through, which may not be everything, but it's looked through

17    what it's looked through for those kinds of things.

18         But, Your Honor, it's much broader here, and I start

19    with what I raised -- and I would go in more detail in an ex

20    parte submission, but I'm comfortable giving some categories to

21    Your Honor to understand the sort of breadth of *Brady* as we see

22    it.

23         So the government charges that these contracts with

24    consultants were a sham, and they attack in part the structure

25    of them.  So the extent that they're interacting, and I think

1    it takes on significance that they're interacting with the

2    alleged co-conspirator surgeon consultants during what the

3    grand jury has said is the conspiracy period.  Anything in

4    which the surgeons, and I think almost all of them indicated at

5    one time or another that the -- that the contracts were genuine

6    and that they performed under them, that the government may

7    also agree -- well, to the extent anyone said this is real,

8    we've turned that over.  But it goes beyond that.

9         And this is that the government is conducting this --

10   what we believe is a joint investigation, Your Honor, not

11   characterized best as a parallel, but it's a joint

12   investigation in which there was communication about witnesses

13   and about how to deal with witnesses and what the requirements

14   were going to be to resolve things with witnesses during the

15   alleged conspiracy period as set by the grand jury.

16        So when -- I don't know that the government would have

17   agreed that whenever a surgeon takes on some accountability and

18   says in certain ways I didn't perform, each and every way that

19   happens is also *Brady,* because the theory of defense here could

20   be this was all genuine.  Another layer of it is this is not

21   only genuine but there are lawyers appearing for different

22   parties, including the company, including some of the surgeon

23   consultants.  This is something that even if a problem

24   developed and the surgeons didn't actually perform as intended,

25   it's the surgeons' or consultants' fault.  Then we're also

1    entitled to any communications that show the presence of

2    lawyers during the conspiracy period.

3            So whatever emails the government is having about

4    internally and externally involving lawyers for any of the

5    alleged co-conspirators during the charged conspiracy period,

6    and I still find the timing of the investigation -- not the

7    timing of the investigation, but the timing of some active

8    investigation during the conspiracy period as creating an

9    uphill battle for the government here because they're

10   influencing people -- one of our defenses can be, by that time

11   that person is acting as a government agent.  That person is

12   cooperating with the government so a jury cannot find that our

13   client conspired with that person because there was not a

14   shared objective.

15           So you have the presence of lawyers for any of these

16   parties.  So when the government is saying so and so lawyered

17   up, that's *Brady* material.  When they lawyered up and the

18   government became aware of it, it affects the government's

19   investigation, when the government does say something to

20   someone, one of these surgeon consultants, if you resolve the

21   civil case you avoid the criminal case, and that involves

22   lawyers present.  That helps this defendant during the charged

23   conspiracy period, that was what was going on with some people.

24   Then you have just the general.

25           We cited to some cases about this in our reply on -- I

1    think it's in footnote 3.  I think it's on page 16 -- my

2    handwriting looks like 18 -- of our reply.  And this seems

3    particularly appropriate in a case like this where the grand

4    jury has charged that kind of a time period.  A party is free,

5    says the Supreme Court, to attack the law enforcement's --

6    examining the law enforcement on good, effective knowledge of

7    someone's statements and attack the reliability of the

8    investigation in failing to even consider someone's guilt, and

9    that could be that one of their cooperators is the only guilty

10   party and someone is doing that.

11        But when they start by demonstrating knowledge of

12   self-incriminating statements, the defense laid a foundation

13   for a vigorous argument that law enforcement would be guilty of

14   negligence.  We're allowed to say that, how they handled these

15   witnesses was inappropriate, whether because the government was

16   saying resolve a civil case by admitting one, two and three, or

17   one, and there will be no criminal charges.

18        We cite to another case there that has that same sort

19   of weaknesses in a government's investigation here during the

20   charged period, which makes it somewhat unique.  We've cited to

21   Judge Saris in the *Wu* case on page 15 of our opening brief, 210

22   Westlaw 817324, consider the theory of the defense balancing

23   the government's claim of entitlement to have inter- and

24   intra-agency communications with our right -- that defendant's

25   right to prepare a defense, and Judge Saris said has to be

1    turned over.  There might be limits on further disclosure but

2    it gets to the -- you know, it gets to the defense to use -- to

3    advance the theory of the case.

4          So I'm not -- I'm quite certain the government hasn't

5    detailed its awareness of the various forms of *Brady* that I've

6    outlined and more that we would supplement with Your Honor,

7    but, you know, I understand that there's a general category of

8    when people say nice enough things about the defendants we

9    consider it *Brady*.  They also have not identified what they

10   reviewed.  They reviewed the file.  They didn't say they went

11   through the intra- and interagency communications, and I think

12   that's extremely important here, Your Honor, at least to the

13   extent that they occurred during the charged period and

14   involved anyone who's a potential named or -- I'm sorry --

15   known or unknown co-conspirator.

16         And the grand jury, you know, we often, as defendants,

17   have to hear how independent the grand jury is in a way that

18   can impact defendant's rights.  But here the grand jury has to

19   be deemed a party that set the parameters of the charges, and

20   it set those charges to include a period in which the

21   government was interacting extensively with people who would

22   fit within the phrase "known and unknown co-conspirators."  And

23   I think a great deal of our defense will involve or could

24   involve -- I don't have to promise that at this stage, but it's

25   certainly preparing the defense to involve assessing every step

1    the government took with alleged known/unknown, named/unnamed

2    co-conspirators during the charged period which ran at least,

3    the words are at least through June 2019.

4           And I can say during that time AUSA Derusha and AUSA

5    George had appeared in the civil case that was pending.  They

6    did that back in the -- AUSA George in 2015, AUSA Derusha I

7    think on June 6th, 2018, and then they proceeded after

8    that with -- and since their appearance there, there have been

9    five interviews of Dr. Montone alone, and that's one of, I can

10   say many or several of surgeons.

11          Another one, Jeffrey Carlson, on July 27th, 2018, an

12   FBI agent, AUSA George and AUSA Derusha interviewed him, and

13   not until, I think it's almost more than a year and a half

14   later, AUSA Derusha and AUSA George file in a civil case an

15   intent to intervene in the qui tam action, and it's only a

16   month or so or more after that when they withdraw and make

17   themselves just part of the criminal investigations they were

18   doing.  But certainly up until then there hadn't been that sort

19   of spit -- steady space that would involve something that's

20   parallel as opposed to joint.

21          I understand the FBI may only have worked on the

22   criminal aspect of it, but I would think that the people at

23   HHS, from what we've seen, might have people -- it would be

24   expected to have people on both the civil and criminal.  So we

25   haven't received the kind of information -- I break this into

1    two categories.  One, I think the government hasn't done
2    enough, even close, to meet its *Brady* requirements.  Separate
3    or related to that, we cite to *Bases*, *Martoma*, *Mahaffy* on pages
4    16 and 17 of our opening brief with the kind of information the
5    Court will often request from the government in order to better
6    assess this issue.  So we don't know what the government means
7    when it said it looked through the files for *Brady* so this is
8    moot.  Did they actually look at the communications with all
9    counsel for potential witnesses?  The mere fact that they're
10   lawyered up is *Brady*.
11         I've seen many a case defended on the fact that there
12   are enough lawyers there someone couldn't have thought
13   something was fraudulent because no lawyers were jumping up and
14   down yelling anything.  Everyone has heard that.  There are
15   times the government doesn't charge when there are this many
16   lawyers this close to events, let alone involve themselves in
17   the charged time period that the grand jury has determined.
18         So I would ask Your Honor to look at the types of
19   information required, and we reiterated from those or drawn
20   from those what's relevant in this case and in our conclusion,
21   but certainly more is required of the government in terms of
22   justifying what, here it seems a fair inference, was a joint
23   investigation, not a parallel investigation.  Even in parallel
24   investigations this kind of information has been required to
25   understand what really needs to be done so that we can defend

1    ourselves against allegations that we, meaning our clients,

2    were conspiring with people during a time period when they were

3    interacting with the government extensively and that lawyers

4    were interacting with the government extensively, and we're

5    entitled not just to know that generally, but we're entitled to

6    defend ourselves against very serious charges because we do

7    know the record contains information that there were -- there

8    was a mix of how to resolve one case and another, that if

9    you -- this is in Attorney Orkand's declaration at paragraph 8

10   that one witness's counsel said that he was told if they

11   resolved the civil case he can avoid criminal charges.

12        So we know this has been mixed and matched, and we're

13   entitled to the government actually going through what it has

14   including intra- and interagency communications, not just so we

15   get a taste of it but so that we could make effective use on

16   cross-examination of what actually exists and what actually

17   happened in there that caused virtually every surgeon to go

18   from saying this is real, my attorney said it was okay, to

19   eventually after enough interaction with the government some of

20   them saying, okay, it wasn't real.

21        And we're entitled to explore that for the weaknesses,

22   for the improprieties in the government's investigation, and to

23   cross-examine -- not just cross-examine but -- it's not

24   cross-examine the issues, it's the actual events that the grand

25   jury has chosen to charge, the time period of it, when the

1    government was so extensively interacting.

2           So we'd ask for both a more extensive and adequate

3    *Brady* search and report to the Court with details about what

4    they did, not just that it's moot because they have done the

5    functional equivalent, and we'd ask for the type of relief

6    we've drawn from *Bases, Martoma*, *Mahaffy* on pages 16 and 17 of

7    our opening brief on the kinds of information about who worked

8    on what, when, and their interaction with these witnesses.

9           And even if someone who was civil and criminal at one

10   point but then becomes only criminal is communicating where

11   there's a civil attorney and saying there's a problem with this

12   witness, I'm not so sure that's work product in the middle of

13   the charged period, but certainly they've got detail to say,

14   this witness is saying X, and we want that witness to say Y.

15   Anything in that direction we're certainly entitled to, and I

16   don't think they've even made that kind of a search through

17   their own communications and the communications of the agents

18   that were involved in underlying events with people who could

19   be considered by a jury to be known or unknown co-conspirators

20   charged by the grand jury, Your Honor.

21          So I think while an uphill battle, I think we meet it,

22   and I think the government, given the type of charge the grand

23   jury has put in here, has its uphill battle, Your Honor.

24          THE COURT:  All right.  I'll hear from the government.

25          MR. DERUSHA:  Thank you, Your Honor.

1          There are a few important points that I want to

2     emphasize this afternoon.  I know we've been going for a while,

3     but I want to begin with an example that defense counsel

4     explained with one of the surgeons that settled civilly with

5     the government because I think it illustrates the fundamental

6     misunderstanding that the defendants have or at least purport

7     to have in connection with this piece of their motion to

8     compel.

9          Dr. Carlson is a surgeon that settled civilly with the

10    government.  And Mr. Pollack describes a meeting that

11    Dr. Carlson had with the government who was at that meeting.

12    And how does he know that?  He knows that because we produced

13    the report of that meeting.  That report notes the counsel that

14    was present, the statements that were made by Dr. Carlson.  And

15    he knows those things because we provided them to him and did

16    not shield the civil investigation from the search for

17    discovery material, *Brady* material, anything else that they're

18    entitled to under the discovery rules in the criminal case.

19          Foundationally, I want to go back to sort of the

20    basics here which is that the government has conducted a joint

21    investigation that had both a civil and a criminal component.

22    The government has been transparent about the fact that this

23    joint investigation had both a civil and criminal component

24    from the outset in 2017 and at every step of the way since.

25          I think Your Honor is right that the defendants have

1    an uphill battle in showing that they're entitled to more than

2    what the government has already produced.  It's well-settled

3    law, Your Honor.

4         I think you're familiar with the cases that we cited

5    in the briefs, but just to touch on them briefly, it's well

6    settled that there's nothing improper about the government

7    undertaking simultaneous criminal and civil investigations or

8    of undertaking simultaneous criminal and civil enforcement

9    actions.  The Ninth Circuit recognized that in *Stringer*, the DC

10   Circuit recognized that in *Dresser*, and most importantly,

11   perhaps, *Kordel*, the Supreme Court case in 1970, recognized

12   that in saying that it would stultify the enforcement of

13   federal criminal law to require a government agency invariably

14   to choose either to --

15        THE COURT:  I don't think I'm going to accept the fact

16   that it was improper for the government to engage in a

17   simultaneous civil and criminal investigation.  So that's fine.

18   I accept that.

19        But I guess the question really is, given the facts of

20   this case and what Attorney Pollack says about the time period

21   that the charges cover as indicted by the grand jury, and then

22   that's the same time period in which you're interviewing these

23   witnesses and settling out a criminal case, you know, telling

24   Dr. Carlson he doesn't need to be charged criminally,

25   blah-blah-blah, what was your *Brady* search during that time?

1          MR. DERUSHA:  Yeah, I appreciate the framing, Your

2    Honor.  I think we said this to the defendants in our discovery

3    correspondence, we've said it in our opposition, we'll say it

4    again now.  For purposes of *Brady* and Rule 16, the government

5    did not draw any distinction whatsoever between the criminal

6    and the civil aspects of the investigation, or to put it

7    differently, the government has searched the files of

8    attorneys, of staff, of law enforcement agents, or anybody else

9    who worked on civil aspects of the joint investigation or

10   criminal aspects of the joint investigation.

11         THE COURT:  And when you say "attorneys," you mean the

12   doctors' attorneys emailing you, you emailing each other, et

13   cetera?

14         MR. DERUSHA:  Your Honor, what I mean is that what we

15   have done here is the same thing that happens in any

16   run-of-the-mill criminal case.  There is an investigation, and

17   the government conducts a review of that single investigation's

18   files for any discoverable material, including *Brady* material.

19   Here there was a joint investigation.  There was joint

20   fact-finding, and we have searched the files of that

21   investigation.  We have never contended, the government has

22   never contended that it could shield the civil components of

23   the investigation from that search for materials wherever they

24   may be found, whoever they may involve.

25         And so it doesn't make any more sense here to conduct

1    the kind of evidentiary hearing or to rummage through the

2    communications of the lawyers who are litigating the case or

3    the civil case than it would in any run-of-the-mill criminal

4    case.  We are not contending that there is a separate body of

5    information that we have no obligation to --

6          THE COURT:  So I think what they specifically seem to

7    be focusing on are the interactions between the criminal and

8    civil teams, and I guess a lot of that is going to be work

9    product and it's going to be protected and you get to discuss

10   your case with your colleagues, obviously, and not have that be

11   discoverable.

12         But I guess they're just asking, and it has been a

13   very long investigation, and it seems to be involving a lot of

14   people being questioned about what they did, and then they

15   change their stories and so on.

16         And I just wonder, have you gone through the emails of

17   the team members, including law enforcement, but also the

18   different attorneys, and scoured that for *Brady*?

19         MR. DERUSHA:  Your Honor, we have conducted the same

20   review that we do in every case, which includes all information

21   that we're aware of.  And again, I want to emphasize what

22   the -- what the defendants have and how this has played out

23   with respect to settling surgeons, including Dr. Carlson,

24   because I think this is illustrative of the reality and not

25   just arguments about, you know, potential information that they

1    think that we haven't searched for despite our repeated

2    assurance that we have searched for that kind of information.

3         The defendants know about -- with respect to any

4    civilly settling parties, they know if those settlements

5    resulted in written agreements because we produced copies of

6    them.  If there was an interview or a meeting with the witness,

7    we produced a report of that.

8         THE COURT:  That's all typically produced.  But I

9    don't know that there's any allegation that you've withheld

10   meetings or that type of thing.  What I thought Attorney

11   Pollack was kind of focusing on was the interaction between the

12   civil and criminal teams, and I know you're entitled to protect

13   your work product and I'm not suggesting you get at that, but I

14   do just want to make sure that that's been searched for *Brady*.

15        I think as these cases develop, sometimes, you know,

16   you do have an ongoing obligation, and I'm not suggesting

17   that's all you do in preparing a case, but I think, as motions

18   like this get filed, sometimes it comes into focus a little bit

19   more what the defense is seeking to use at trial and that type

20   of thing.  And I do think you have an obligation, especially if

21   there's a fairly specific request like this, to make sure

22   you've looked.  And what I hear you saying is we do what we do

23   in every case, and I don't really hear you saying, yes, we've

24   done that, what you're specifically asking about.

25        MR. DERUSHA:  Your Honor, we have searched for *Brady*

1    material that includes through emails.  If we discover

2    information that has not been produced but it's *Brady* material,

3    we're aware of our ongoing obligation and would abide by our

4    ongoing obligation.

5         But the key point, though, is this, when there is a

6    joint investigation, because that's really what the motion is

7    arguing, is that there's an additional obligation.  And what

8    I'm saying is that we understand there's an additional

9    obligation.  That's to broaden the scope of where you look or

10   at least not to shield off part of the investigation under, you

11   know, for the reasons that it was civil or that it was a

12   different government agency conducting that piece of the

13   investigation, and we have not done that.

14        And I think that the -- well, the defendants' papers

15   go far beyond just searching for, you know, email

16   communications the way that Your Honor just phrased it.  They

17   want all of our communications with one another.  They want an

18   affidavit describing every communication that we've had with

19   one another.

20        THE COURT:  I don't think that -- I don't think that's

21   required, and I've never seen that required in a case.  And I

22   appreciate your transparency.  I mean, I did recently have an

23   SEC case where the government went to great pains to keep the

24   investigation separate from the criminal case, and there was

25   very little overlap and very little searching for *Brady*, and so

1    I think it's great what you've done.

2         I do think they have a rather advanced view of what

3    *Brady* constitutes -- you know, what constitutes *Brady* here.

4    And I hope you will keep looking as you hear from them what

5    they consider to be important to their defense.  I'm not going

6    to order you to provide every -- an affidavit with every

7    communication in it.  I don't think that's required.  I'll take

8    another look at the pleadings because these -- I know we just

9    got something late last night that I only read through once,

10   but we will -- I hear you on that.

11        MR. DERUSHA:  And, Your Honor, we, of course,

12   understand our ongoing obligation, and we do have that in mind.

13        There are two other issues that I want to touch on

14   because there is some fairly significant things that the

15   parties -- that the defendants have said in their papers that I

16   want to address before we wrap up today.  And that is, when

17   there are joint investigations, there are two kinds of concerns

18   that courts have identified.  One is the scope of what the

19   government is obligated to search for.  We've been talking

20   about that.  The other concern is about whether there has been

21   transparency with the parties about the fact that there is a

22   joint investigation and the fact that there is the possibility

23   of criminal enforcement when there is a civil matter going on.

24        And I want to address an argument that defense have

25   made in the papers in the parallel civil matter that the

1    parties -- these defendants are being coerced into a

2    settlement, which they say that entitles them to additional

3    discovery in the criminal case.  And I want to be crystal clear

4    about this, that the criminal team here, although we have not

5    separated for purposes of conducting a review for *Brady*

6    information and for other discoverable material, we have not

7    separated the teams for that purpose.  We have separated the

8    teams for purposes of litigating the civil case and the

9    criminal case and for the purposes of, you know, the settlement

10   is reached in the civil matter.  We're not involved in that.

11   There's a separate government team that's handling that.

12        But the defendants seem to be suggesting that the

13   criminal case emerged only because civil settlement discussions

14   had stalled and then the government sought an indictment for

15   that reason, and they also contend that the civil settlement is

16   a result of coercion in the criminal case.  And these are

17   significant things for the defendants to say.  And I want to

18   address this briefly, each of those points.

19        With respect to the civil settlement, if it is the

20   position of the defendants that they are being coerced into

21   entering into that civil settlement, I think they should say so

22   to the Court today, and if that is their position, we would

23   expect that they would walk away from the civil settlement.  No

24   party should enter into a resolution that they are not entering

25   into freely and voluntarily, and they should not represent to

1  the Court, and as I believe they have in the civil case, that

2  there is an agreement in principle.

3         On the other hand, if they do wish freely and

4  voluntarily to settle the civil case, that's up to them, that's

5  up to the civil attorneys handling the matter for the

6  government, but they can't have it both ways, suggest that

7  there's coercion forcing them to do something.  If they are

8  being coerced, they should not settle the civil case.

9         So I just want to be clear that we're not involved in

10  those negotiations, to the extent they're ongoing, but it is

11  certainly not a ground for additional discovery in the criminal

12  case.  With respect to the timing of the indictment, because

13  this is important to us, that there be --

14         THE COURT:  So I think you did a great job in your

15  brief, and I don't have any issue with the timing of the

16  indictment.

17         MR. DERUSHA:  Okay.

18         THE COURT:  I think you did a great job answering

19  that.

20         So I would like to move on to 108 and hear the

21  government briefly.  And I'll just say, I don't really

22  understand the legal basis for filing a motion for discovery

23  for such an old administrative subpoena.  I just don't -- I

24  don't know if that's really proper to be -- for me to be

25  treating it as a discovery matter in the criminal case.

1          MR. DERUSHA:  Your Honor, I'm happy to address this

2     briefly because I think it does boil down to just a few salient

3     points.  You know, we filed our motion as not a Rule 16 motion.

4     We filed it pursuant to the statute that allows us to seek,

5     allows the government to seek the aid of any court's compelled

6     compliance with an administrative subpoena.  It's obviously

7     related to this case, and so we filed it on the docket.

8          THE COURT:  Do you know of another case in which -- a

9     criminal case in which something like this has been litigated?

10          MR. DERUSHA:  I think the defendant explained it in

11     the Insys case where there was a post-indictment subpoena.

12     There was an indictment issued post subpoena.  I'm sorry.  A

13     subpoena issued post indictment, and that was brought before I

14     believe it was Magistrate Judge Boal in connection with that

15     case.  There was not a separate docket.  And I think that

16     sometimes happens in the context of, for example, it hampers

17     orders where there are third-party subpoenas to collect

18     information pursuant to a HIPAA subpoena, and I think those two

19     end up filed, if they are related to a pending criminal case,

20     on the docket of the pending criminal case.

21          But I think, Your Honor, really the issues boil down

22     to just four points.

23          THE COURT:  Can I just ask you again.  Do you know of

24     a case in which a pre-indictment HIPAA subpoena was then the

25     subject of a motion during a criminal case?  I just don't -- I

1    mean, again, this case just has so many weird twists, but it's
2    just a very old HIPAA subpoena, and I don't know that I ought
3    to be enforcing it here during the criminal case.  You have --
4    I mean, the entity is a criminal defendant, right?  And now I'm
5    enforcing a very old subpoena against it during the criminal
6    case.  It just feels odd.
7         MR. DERUSHA:  Your Honor, I'm not aware -- the
8    government is not aware of a case that addresses this
9    particular issue.  I don't think the defendants are either.
10   What they have cited, and they acknowledge that this is the
11   case, that they're citing a case where there are subpoenas
12   issued after the indictment.  So I'm not aware of a case where
13   that --
14        THE COURT:  I'm just always really wondering whether
15   there's no case law of this because it just isn't done.  It's
16   like no government lawyers have been trying to do this.  This
17   is like -- because I know the statute says any court can
18   enforce it, but I just -- we are in the middle of a criminal
19   case.  So -- yeah.
20        MR. DERUSHA:  Well, Your Honor, I say a few things.
21   First of all, the standard that applies to administrative
22   subpoenas is straightforward, and it asks whether the subpoena
23   was validly issued.  It was validly issued.  There's really no
24   contention about that here.  It was valid when issued.  And
25   then -- but the rest of the analysis, which the case law Judge

1    Burroughs set this forth in *Joint Active Systems*, which we

2    cited, is a limited review, and asks whether the materials are

3    material, and then if they are, the burden shifts to the

4    parties subpoenaed to show that it would be unduly burdensome

5    to produce them.  Those are the only valid questions.

6            There's no authority that the defendant has cited, and

7    there's no authority that we're aware of, that a validly issued

8    subpoena expires most of the time.  So we think those are the

9    only questions that the Court needs to answer, and I suppose

10   the reigning question, which is a logical one, is whether

11   SpineFrontier has already complied with the subpoena.  I don't

12   think that there's any contention that they have with respect

13   to the net sales data that is the subject of the motion.  We've

14   asked for that data.  The company had produced a summary

15   spreadsheet that showed both gross sales and net sales.  It was

16   a simple document, but it was produced by a lawyer for the

17   company.  And for a variety of evidentiary reasons, and to

18   avoid litigating issues around who was producing it in what

19   form, we requested that the company, which would be responsive

20   to the subpoena, supply the underlying document that he or

21   whoever created this document relied on.

22           What they gave us was half of the information.  They

23   gave us gross sales data, and those are contained on -- they're

24   called usage forms that show a price.  It's one figure.  And

25   there are a lot of those usage forms.  There's a great volume

1    of them.  But you cannot find both gross sales and net sales

2    from one figure.  It's just impossible.  And so I don't think

3    there's any question that Spinefrontier has not fully complied

4    with the validly issued subpoena.

5        And the last point that I would say here, just to

6    reiterate what we said in our brief, prior counsel for the

7    company had told us that he was prepared to produce this

8    material, had it available in a QuickBooks data file or

9    something similar to a QuickBooks data file, and so we know

10   that the data exists.  We know that whoever created the summary

11   chart had to consult something.  We don't think the summary

12   chart was inaccurate.  We're just trying to address the

13   evidentiary issue or the privilege issue or whatever else might

14   arise from the fact that there's a summary chart containing

15   this information.

16       To the extent that the sort of procedural issues stand

17   in the way, we've suggested to them, to the company, that we

18   would be content to accept a stipulation saying that that

19   summary chart is admissible evidence and then nobody needs to

20   produce anything further.  They've already produced that chart

21   to us, and that would fully resolve this issue.

22       We're really looking to be practical on this.  The

23   subpoena has been outstanding for quite some time.  Your Honor

24   is quite right about that.  We have been seeking compliance

25   with the subpoena for quite some time.  And that has not always

1    been with current counsel, that's true.  I made this point in

2    our opposition.  But we have sought this -- we, the government,

3    have sought this information from a variety of SpineFrontier

4    lawyers numerous times.  We set that out in the briefing.

5         So I think I'll leave it there, unless Your Honor has

6    any further questions.

7         THE COURT:  No.  Thank you.

8         And to the defense, what about just stipulating to the

9    chart that your client previously provided?  What's the problem

10   with that?

11        MR. POLLACK:  We're not in the position to do that at

12   this time, Your Honor.  What I will say is that there was a

13   production in January 2022 of 31 thousand-plus pages by

14   Attorney Weinreb and then nothing again on this issue until the

15   letter that we received.  And we've confirmed with Mr. Weinreb,

16   and I think he would describe things quite differently than

17   Mr. Derusha.  There are factual questions here.  I think that

18   their burden is to show more than just a valid subpoena and a

19   lack of a response when enforcing -- trying to enforce a

20   nonself-executing subpoena.  They haven't made remotely a

21   showing of contumacy or what courts would say is required.

22        And they've tried to do it.  I think they've said,

23   look, we can file another proceeding.  Well, they might be able

24   to.  And if they do that, people will address it as they file

25   another proceeding.

1              But, Your Honor, the Federal Rules of Criminal

2     Procedure apply in this court, in this case for the benefit of

3     all the parties, including the defendants, and the Federal

4     Rules of Criminal Procedure instruct this Court in Rule 17 how

5     to handle subpoenas.  It does not leave open the possibility

6     of, well, you know, you can go to any court.  Does that mean

7     they can go to a small claims court and have a small claims

8     court enforce the subpoena?  I don't think so.  I don't think

9     any court in the statute means that Your Honor has to ignore

10    the Federal Rules of Criminal Procedure in a criminal case and

11    be the first court in this country to accept the invitation to

12    enforce a three-and-a-half-year-old-plus subpoena served

13    contrary to Department of Justice guidelines -- not served.

14    I'm sorry.  The attempt to enforce it because the position

15    Mr. Derusha has taken is contrary to the language we cite from

16    the Department of Justice guidelines about not -- not trying to

17    enforce it against.  It doesn't say you can't --

18              THE COURT:  Sorry.  You lost me.

19              MR. POLLACK:  We cite to the Department of Justice

20    guidelines on --

21              THE COURT:  Okay.

22              MR. POLLACK:  -- I had the page.  U.S. page 6, right?

23    Next to 9-44 to 2025.  "After indictment has been issued,

24    authorized investigative demands may continue to be used in

25    furtherance of an ongoing investigation provided they are not

1    directed to a defendant."  So they're even -- I know that those

2    are not binding and courts will often say they're not binding.

3    But I'm not going to let somebody do something odd that there's

4    no authority for that's contrary to the Department of Justice

5    guidelines and then finds no home or basis in Rule 17 or other

6    rule under the Federal Rules of Criminal Procedure.  And

7    despite the word "any court," each court, whether a criminal

8    court or some other limited court of certain jurisdiction needs

9    to apply its procedural rules, and they do not include

10   overriding the Department of Justice guidelines here to find

11   some home in Rule 11 and 17.

12        And we do take issue, and there would be factual

13   issues about what was produced and whether it's sufficient.

14   Mr. Weinreb would be willing to, I think -- we can provide more

15   information about that.  But this just seems like taking a

16   stale subpoena.

17        Mr. Callahan was present when Your Honor asked if

18   there was anything else that needed to be -- I think it was

19   June 28th we had the hearing.  We had our motion.  We

20   disclosed.  We said what we were putting together.  We came

21   forward with it, and then they raised this issue for the first

22   time two or three weeks later.  I did want to end that there,

23   unless Your Honor has questions about that.

24        But I did have one comment because there was something

25   the government said on the last issue that I want to make sure

1    there's nothing in the record that misstates our position.

2    We're not looking --

3        THE COURT:  If I could just ask a question about what

4    you said before, before you say something else.

5        MR. POLLACK:  Sure.

6        THE COURT:  So you said Mr. Weinreb would be willing

7    to answer questions about what?

8        MR. POLLACK:  No.  I said.  Okay.  Mr. Weinreb --

9    we've consulted with Mr. Weinreb about what took place, and he

10   would say there was no request made of him, I believe.  That's

11   what we confirmed after the production of 31 thousand-plus

12   pages, and he understood it was done, right?  And that based on

13   the discussions he had had, this issue was resolved, as we

14   understand it, and that would be January --

15       THE COURT:  So you are saying that the materials that

16   the government is seeking are in those 31 thousand pages; is

17   that what you are --

18       MR. POLLACK:  I have not reviewed those 31

19   thousand-plus pages.

20       THE COURT:  So did you talk to Mr. Weinreb, and he

21   said he thought the issue was resolved; and did you understand

22   that to mean that the information the government seeks is in

23   the 31 thousand pages that he turned over?

24       MR. POLLACK:  The way the government frames it now at

25   this hearing, I'm not sure --

1          THE COURT:  No, no.

2          MR. POLLACK:  -- but at the time I understood --

3          THE COURT:  Regardless of how the government is

4    framing it now, when you spoke to Mr. Weinreb about what he

5    turned over, is it your understanding he thinks he turned over

6    the information that we're arguing about, at least here, and

7    filing all this stuff about?  Is it in the 31 thousand pages,

8    Mr. Pollack?

9          MR. POLLACK:  What we confirmed with Mr. Weinreb about

10   was what happened then, and what we understood was that he had

11   discussions with the government, he produced 31 thousand-plus

12   pages that resolved what they sought.  And until whatever it

13   is, some 18 months later, is the first anyone is hearing that

14   there was something missing from that.  I do not know whether

15   Mr. Weinreb reviewed the 31 thousand pages or someone in his

16   office did to know whether how the government is defining net

17   versus gross, what exactly is in there; that I'm not prepared

18   to take a position on myself because I haven't reviewed it and

19   I have not posed that question to Mr. Weinreb.

20          (Parties talk over one another.)

21          THE COURT:  Okay.  So what was the last point you

22   wanted to make?

23          MR. POLLACK:  So where the issue went on what would

24   constitute *Brady* as a result of the overlapping or joint

25   investigation, it's not just the internal communications.  I've

1    looked back, and maybe there's a sentence in there that
2    suggests otherwise, but categorically, we were looking for more
3    information about how they interact and the nature of it, not a
4    communication-by-communication log or description.  So we
5    wanted -- I think when Your Honor looks at the *Bases* case and
6    *Mahaffy* and those on 16 and 17, you'll see the kind of
7    information that just helps frame this.  But what's missing is
8    separate and related to the communications with each other, the
9    communications with the witnesses and their lawyers.  What I'm
10   hearing from the government when Your Honor asked them if they
11   searched things, it kept sounding to me like the answer was we
12   do what we do in every case, and it wasn't a yes.  And I do
13   think they have to look at all of their communications.  I
14   guess the right time we issued subpoenas for communications --
15          THE COURT:  So from receiving exculpatory evidence
16   from the government in many cases that I get -- I would get
17   emails from agents to prosecutors talking about something a
18   witness had said, and if it differed in any way from some other
19   thing the witness had said, that would get turned over.  And
20   sometimes it gets turned over right on the eve of trial because
21   they're emailing in trial preparation and that type of thing.
22   So my understanding is the government does review those kind of
23   emails and communications, and if they're communicating
24   directly with a witness and not through their lawyer, which I
25   think would be kind of unusual but not unheard of, but anyway,

 1    I'm assuming that they've done that.

 2         MR. POLLACK:  But I didn't hear him say that.  I think

 3    their communications with counsel during the charged conspiracy

 4    period is --

 5         THE COURT:  You're talking about counsel for the

 6    witnesses and people they were investigating?

 7         MR. POLLACK:  Well, I'm making a similar assumption I

 8    think Your Honor made, that once someone is represented, the

 9    lawyers are probably not communicating with the witness,

10    they're probably communicating with the witness's counsel, and

11    maybe the agents are communicating with the witnesses.  But as

12    I said, the presence of counsel for each of these people

13    becomes critical to us defending that at certain portions of a

14    charged conspiracy period couldn't have been conspiring.  It's

15    a lawyer all over it for them, and the government is even

16    interacting with them.

17         I don't think the government has said that it has

18    looked at all of its communications with lawyers for witnesses

19    or witnesses themselves and turned those over.  And to the

20    extent that there are lawyers involved, that by itself is

21    *Brady*.  And the more lawyers involved, the less likely they

22    could prove that we are conspiring with a witness who's

23    surrounded by counsel who's communicating with the government,

24    and I think we get to see what those communications look like,

25    particularly during the charged conspiracy period.  We have to

1    defend it.  How could we conspire with -- they gave one name of

2    one of the several surgeons, but with that person in the weeks

3    and months that he's represented by counsel communicating with

4    the government, we get to see they're not just saying hello.  I

5    don't think we're just stuck in the final agreements.  In this

6    case where there are communications and drafts during the

7    charged conspiracy period, drafts of agreements with these

8    people going back and forth with lawyers during the charged

9    conspiracy period, I can't see how that's not the epitome of

10   *Brady*.  And they have not said that they looked at that.

11          What they said was they turned over final agreements,

12   not the underlying communications that would show counsel all

13   over events during the charged conspiracy period, not drafts of

14   them that would show the evolution of how some of these

15   surgeons turned from people who said that they performed to

16   people who didn't perform.  And I think where it goes to the

17   culpability of the potential co-conspirators, that's just

18   *Brady*.

19          So that's where I'll leave it, Your Honor.  I know

20   I've gone on, but it was said that we were just looking for the

21   internals.  Yes, I think where there is an internal that says

22   I've communicated with that lawyer, here's what I told them,

23   we'd get that, too, because I think they were coordinating

24   things like that.  But I don't want to lose sight of the fact

25   that they haven't done the fundamental task of looking at their

1    own communications and their agents' communications with

2    counsel where it shows the presence of counsel during the

3    conspiracy period.

4         THE COURT:  Where it shows the presence of counsel for

5    other people they're investigating during the period.

6         MR. POLLACK:  This is the oddity that they didn't just

7    investigate after the charged period.  They investigated --

8    we're charged with -- I think you can read the charges that say

9    we're charged with conspiring with Montone, and -- I'm

10   forgetting the other name -- Carlson, who they mentioned, and

11   others, and they're communicating with counsel affecting the

12   events during the charged conspiracy period.  At times someone

13   becomes -- eventually someone who is doing what the government

14   instructs and then they can't be conspiring with us, for

15   instance.  We get to see that.

16        And when counsel is present -- I mean, a jury could

17   find we're not guilty for various reasons early on until some

18   knowledge accumulates, but then at that later point, perhaps

19   when the knowledge has accumulated of something, lawyers are

20   already involved, and those people can't qualify as

21   co-conspirators because all they're doing is what the

22   government is asking or they're trying to work with the

23   government.  And besides which, lawyers are present, and we all

24   know that is a theory of defense is it couldn't have been

25   fraud, there are lawyers all around it.  I know it might work,

1    it might not.  It doesn't have to rise to the level of reliance

2    on counsel, but lawyers being present and no lawyer raising a

3    hand saying this is wrong, can be a theory of defense.  So the

4    fact that not only we have lawyers but these surgeons had

5    lawyers and they're involved, well, during that period when

6    they had lawyers, how can we be conspiring.  The lawyers aren't

7    saying don't talk to them, don't do this.

8            So I think they're just ignoring those types of areas

9    beyond just the more complicated internal communications, which

10   I still think they have to look at.  And it might be that

11   looking at their communications with these lawyers for

12   witnesses would then inform a narrower way to go about looking

13   for how they communicated internally about what they were doing

14   with witnesses who are alleged co-conspirators during the

15   alleged conspiracy period because that is really unusual here.

16           I have to admit that I've been involved in a lot of

17   cases, and I haven't had the government so involved with so

18   many alleged co-conspirators for a year and a half or more

19   during the charged period.  That's just an oddity.  It happens

20   sometimes at the tail end.  It's limited.  It's isolated.  Here

21   it just permeates more than a year and a half or two years of

22   the charged period, and we have to defend that, Your Honor.

23           THE COURT:  Okay.

24           MR. DERUSHA:  Your Honor, I'm sorry.

25           THE COURT:  Go ahead.

1          MR. DERUSHA:  Just on the government's motion to

2     compel, I won't go back on the motion from the defendants.  I

3     think you understand our position on that, that we have not

4     excluded anything on account of the fact that there was a joint

5     civil investigation.  But on the government's motion to compel,

6     I just wanted to address briefly what counsel said about

7     Mr. Weinreb's involvement.

8          Just to clarify the time line, Mr. Weinreb was counsel

9     to SpineFrontier after the indictment, provided documents in

10    response to our request after the indictment.  It was a high

11    volume of material.  It took us some time to look through those

12    materials.

13         I'm not aware of a single page in those 31 thousand

14    pages that they're referring to that contained a second figure,

15    net sales.  If that data exists, we would be happy to be

16    directed to it.  We've asked the defendant, we've asked

17    SpineFrontier to direct us to that if it exists.  It does not

18    exist, or at least if it does, nobody before Your Honor right

19    now is aware of it.

20         And so we asked for the request to be met and for that

21    data to be provided.  And I don't think Mr. Weinreb would say

22    anything different.  But ultimately the issue comes back to

23    whether or not the company has complied with the subpoena.  The

24    subpoena was validly issued when it went out, and the company

25    has not fully responded to it, and I think that's all it comes

1    down to.

2              THE COURT:  Okay.  All right.  So I'm taking this all

3    under advisement, and I appreciate everyone's fortitude this

4    afternoon.

5              Thank you very much.

6              And I'll try to move on this as quickly as I can.

7              Thank you.

8              (Recording ends.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Linda Walsh, Registered Professional Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the audio-recorded proceedings held in

8    the above-entitled matter, to the best of my skill and ability.

9          Dated this 16th day of September, 2023.

10

11

12

13              /s/ Linda Walsh

14              Linda Walsh, RPR, CRR

15              Official Court Reporter

16

17

18

19

20

21

22

23

24

25