## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES

    v.

KINGSLEY R. CHIN,
    *Defendant*.

No. 1:21-cr-10256-IT

### DEFENDANT CHIN'S OPPOSITION TO GOVERNMENT'S
### MOTION *IN LIMINE* TO PRECLUDE ANY EVIDENCE
### OR ARGUMENT CONCERNING LEGITIMATE CONSULTING

Defendant Kingsley Chin respectfully opposes the government's motion *in limine* that attempts to preclude him from using evidence or making arguments concerning legitimate consulting activity by surgeons who participated in the SpineFrontier consulting program but whom the government does not view (or no longer views) as co-conspirators. To be clear, Dr. Chin has no intention of parading witness after witness to testify that all their consulting work was legitimate. But certain consultants are necessary to place purposes and statements in context. As described below, among other things, a jury must determine the motivating factor for payments and whether any desire for business was merely a hope or expectation, rather than an actual purpose of the consulting program.

In its effort to preclude evidence helpful to the defense, the government's motion describes a theory of conspiracy to violate the Anti-Kickback Statute (the "AKS") that deviates from certain language in the Superseding Indictment and is one to which the government has refused to commit to limiting itself at trial. The motion also fails to appreciate the relevance and exculpatory nature of the evidence it seeks to preclude, even if the motion's description of the conspiracy were

accurate; for example, it fails to acknowledge that Dr. Chin is entitled to introduce at least a fair amount of "good acts" evidence under Fed. R. Evid. 404(b).

### The Motion Is Undermined by the Government's Ongoing Lack of Clarity as to its Theory of Conspiracy and Allegations in the Superseding Indictment That Contribute to That Lack of Clarity

The government's motion is premised on its assertion that "the Indictment alleges that the Defendants' consulting arrangement *in practice* was unlawful with respect to *certain* surgeons." (Govt. Mot. at 2 (first emphasis added).) From that premise, the government argues that evidence and argument of legitimate consulting by other surgeons would be inadmissible good-character evidence under Fed. R. Evid. 404. Even in making this argument, the government tries to hedge, telling the Court in a footnote that the government does not concede that there was *any* legitimate consulting. (Govt. Mot. at 2 n.1.) In any event, the motion's description of the Superseding Indictment's allegations is incomplete and fails to account for the government's ongoing lack of willingness to clarify its theory of conspiracy for trial.

From the original Indictment to the Superseding Indictment, and through a concomitant change in identification of unindicted co-conspirators, the conspiracy charge in this case has undergone significant changes, with some aspects narrowed and some made more vague. On April 1, 2025, the government obtained and filed a Superseding Indictment, which continues to include a conspiracy charge as Count One. The government's theory of conspiracy has presented an ever-moving target for the defense as trial has approached.

In the months leading up to the previously scheduled March trial date, the government's view of the conspiracy shifted dramatically, and several times, including in temporal scope and membership. That lack of clarity as to what Dr. Chin is being charged with has continued, and even been exacerbated, following the April 1 Superseding Indictment. The new Indictment suggests on its face an alleged conspiracy focused on paying supposed bribes to three particular surgeons: Drs.

Jason Montone, Michael Murray, and John Atwater.[1] The government has, however, also attempted to use some vague language in an effort to reserve for itself the right to prove a broader conspiracy at trial, not limited to those three surgeons. Yet in doing so, the government has also refused to provide detail as to its broader theory of conspiracy. This lack of clarity has hindered Dr. Chin's preparations for trial and led to Dr. Chin requesting from the government a bill of particulars as to the conspiracy charge, which the government has refused to provide.

More specifically, the original Indictment included allegations making clear that the government viewed the AKS conspiracy as alleging that the defendants put in place and used a "sham consulting *program*." Nowhere in the Indictment was there an allegation that the defendants' supposed conspiracy was to use an otherwise-legitimate consulting program to pay kickbacks, sometimes. To the contrary, in Paragraph 29 of the Indictment, under the heading "Overview of the Conspiracy," the Indictment alleged that defendants are responsible for directing bribes to surgeons "pursuant to a sham consulting *program*." Paragraph 30 also referred to "SPINEFRONTIER's sham consulting *program*." In Paragraph 32, the Indictment alleged that Dr. Chin and Mr. Humad "designed" the consulting program for the purpose of making "bribes" to surgeons. In Paragraph 37(j), the Indictment alleged the creation of records and documents, "including purportedly legitimate contracts, designed to make the *sham consulting program* appear legitimate." The Indictment also impugned the entirety of the consulting program by alleging that Impartial Medical Experts, LLC ("IME"), the entity through which *all* consulting payments were made after a particular period, "*purported* to manage the process pursuant to which

---

[1] The Superseding Indictment identifies these three doctors as Surgeons 1, 2, and 3, respectively. In the original Indictment, these same surgeons were referred to as Surgeons 1, 3, and 5, respectively. Because the government changed the pseudonyms when it obtained the Superseding Indictment, this motion refers to the three doctors by name to avoid confusion. The government has informed Dr. Chin that it does not object to use of the surgeons' names in filings, and has itself mentioned surgeons by name in its filings.

SPINEFRONTIER's surgeons submitted hours and received payments from or on behalf of SPINEFRONTIER for *purported* consulting." (Indictment ¶ 4 (emphases added).) Consistent with the allegation that defendants conspired to design and implement a "sham consulting program," the original Indictment also included among the alleged manner and means of the conspiracy the following as to IME: "Holding out IME as a separate and independent entity from SPINEFRONTIER … in part to evade Sunshine Act reporting obligations." (*Id.* ¶ 37.c.) Similarly, in another filing that the government made while the original Indictment remained the operative pleading, the government referred to IME as "a sham entity," consistent with the Indictment's allegations of a broad conspiracy concerning the consulting program generally. (*See* ECF No. 248, at 7.)

In short, the sweeping conspiracy in the original Indictment that the Grand Jury returned was one by which defendants and others supposedly "designed" and used a "sham consulting program," not one in which they conspired to *sometimes* use an otherwise-legitimate consulting program to make kickbacks to certain surgeons on occasion. Consistent with that theory of a sham-consulting-program conspiracy, the government provided defendants at the outset of the case with a lengthy list of alleged unindicted co-conspirators, consisting of nineteen names, including surgeons, SpineFrontier employees, and others.

In the lead-up to the earlier-scheduled trial date, the government's depiction of the conspiracy began to shift, as the government came to realize that it could not possibly prove that the consulting program was a "sham." On January 17, 2025, the government sought dismissal of all charges against SpineFrontier, as well as Counts Six and Seven against Dr. Chin and Mr. Humad, which had charged AKS violations based on consulting payments to two particular surgeons. (ECF No. 225.) Other than dismissing all charges against SpineFrontier, that action by

the government did not, at least formally, make *any* changes to the conspiracy charged in Count One. Nor did the government alter its list of unindicted co-conspirators at that time, even to remove the two surgeons who were the subjects of the two substantive AKS counts that it dropped. The government told the Court, however, without explanation, that dismissing Counts Six and Seven would "streamline" the trial. Then, on February 26, 2025, the government sought dismissal of yet another of the AKS charges, Count Four, concerning consulting payments to a third surgeon. It again represented that doing so would "streamline" the case. (ECF No. 267.) As with its earlier dismissal of Counts Six and Seven, however, the government did not make any alterations to Count One. Nor did it make any alterations to its list of unindicted co-conspirators.

After the Court continued the previously scheduled trial date, the government appeared to retreat further from its broad conspiracy allegations set forth in the original Indictment. First, it provided defendants with a new list of unindicted co-conspirators, consisting of only five names – down from the nineteen names in the prior list. Three of those five names were Drs. Atwater, Murray, and Montone, the three surgeons who were the subject of the remaining AKS charges after the dismissal of Counts Four, Six, and Seven. The two other names on the government's new list consisted of John Balzer, who was a close affiliate of Dr. Montone, and Scott Autrey, a former SpineFrontier employee.

Next, on April 1, 2025, the government provided Dr. Chin with the Superseding Indictment. As discussed in more detail in Dr. Chin's pending Motion for a Bill of Particulars With Respect to Count One of Superseding Indictment, (ECF No. 322), the changes to the Indictment suggested in various ways that the conspiracy charge was now limited to an alleged conspiracy to make unlawful payments to Drs. Montone, Atwater, and Murray specifically. (*See generally* ECF No. 322, at 6-7.) Such changes included shortening the conspiracy period and changing the amounts

of payments alleged in the Superseding Indictment, to correspond to time and payment allegations about Drs. Montone, Atwater, and Murray specifically. At the same time, however, Dr. Chin recognized some ambiguity on this point, as the Superseding Indictment occasionally uses "including" before its references to Drs. Atwater, Montone, and Murray when discussing the alleged conspiracy. (*See, e.g.* Superseding Indictment ¶ 23.) Furthermore, the Superseding Indictment continues to refer to "a sham consulting *program*." (*Id.* (emphasis added).)

Dr. Chin thus sought clarification from the government that its theory of conspiracy was as a conspiracy to violate the AKS with respect to the three specific doctors. As discussed in more detail in Dr. Chin's motion for a bill of particulars, the government declined to provide that clarity. (ECF No. 322, at 7-8.) To the contrary, the government expressly purported to reserve for itself the right to pursue a conspiracy theory broader than one directed toward payments to the three physicians that are the subject of the remaining AKS counts. (*See id.* at 8.)

Then, injecting even more confusion as to the scope of the charged conspiracy, the government made other filings that seemed to waver between reiterating the limitations suggested by the Superseding Indictment and suggesting a broader theory of conspiracy. For example, in a motion *in limine* that it filed on April 11, 2025 (the same day as, and thus not addressed in, Dr. Chin's motion for a bill of particulars), the government again suggested that it viewed the conspiracy as linked specifically to Drs. Montone, Atwater, and Murray (i.e. Surgeons 1, 2, and 3). In that motion, it wrote, "the Superseding Indictment alleges, and the government intends to prove, that there was a conspiracy between Chin and Humad, and Surgeons 1-3, and others, pursuant to which Chin and Humad paid *certain* doctors (*Surgeons 1-3*) for use of SpineFrontier's products, rather than for bona fide consulting." (ECF No. 320, at 4 n.1 (second emphasis added).) In that very same filing, however, the government also repeated its earlier statements that IME was "a

total sham," (*id.* at 9), and appeared to allege that there were conspirators beyond the five in its reduced list of unindicted alleged co-conspirators. For example, the motion refers to Vanessa Dudley, Dr. Chin's wife, as a coconspirator, (*id.* at 6 n.4), despite the government having *removed* her from its list of unindicted alleged co-conspirators when it provided the defense with a new list following the March 6 hearing. The motion also refers to "third-party distributors" and "employees," both in the plural, as co-conspirators, (*id.* at 7, 11, 12), despite having *removed* from its list of unindicted alleged co-conspirators all but one distributor and one employee.

In short, the government's still-shifting theory of conspiracy not only continues to impede Dr. Chin's trial preparations, but it also makes entirely inappropriate the government's effort to limit Dr. Chin's trial evidence at this stage. Contrary to the suggestion in the language of the Superseding Indictment, albeit with some degree of ambiguity, the government's position appears, at least at times, to be that the conspiracy charged in Count One is *not* limited to an agreement to make illicit payments to three particular doctors. As was the case in the original Indictment, the government instead appears to reserve a vague right to argue that the conspiracy charge includes *design* and *implementation* of the consulting *program*, including with surgeons beyond the three specifically identified in the Superseding Indictment.

In fact, notwithstanding the position in the government's motion, the government itself has stated an intention to introduce extensive evidence of consulting payments to surgeons whom the government does not claim were members of the alleged conspiracy. For example, the government has included in its trial exhibits evidence of payments not just to Drs. Montone, Atwater, and Murray, but also payments to such surgeons as Jeffrey Carlson, Steven Anagnost, Jeffrey Bash, Roger Sung, Vivek Kushwaha, Matthew Wasserman, Joseph Shehadi, Druv Pateder, Mark McFarland, Anthony Alastra, Josue Gabriel, Agha Khan, Bonaventure Ngu, Jacob Rosenstein,

John Shiau, Fernando Techy, Jason Tinley, Jeremy Wang, Warren Yu, Paul DeGenova, and Jeffrey Moore, (*see, e.g.*, Govt. Trial Exs. 2-1, 2-9, 70, 101-1, 101-2, 101-3, 101-4, 101-5, 101-6, 101-7, 101-8, 181, 182, 183, 184, 185, 255, 522), as well as evidence of sales of SpineFrontier products to a lengthy list of surgeons, (*see, e.g.*, Govt. Trial Exs. 9, 18, 58). The evidence of sales and payments to surgeons includes some whom the government dropped from its earlier list of supposed unindicted co-conspirators, and many whom the government has never alleged were themselves part of any conspiracy. While intending to use such evidence, the government's motion hypocritically seeks to preclude the defense from introducing exculpatory evidence concerning any of those surgeons. In other words, the government has alleged a "sham consulting program" and intends to introduce a large amount of consulting payments across numerous consultants, while preventing Dr. Chin from showing the legitimacy of activities except with respect to three consultants. That tactic would be fundamentally unfair and misleading for the jury.

In light of the government's shifting position on the scope of the charged conspiracy, its unwillingness to limit the conspiracy charge to payments to three particular surgeons, and the Superseding Indictment's continued references to a "sham consulting program," evidence of legitimate consulting through the SpineFrontier consulting program is unquestionably relevant, as it counters the allegation that the consulting *program* was a "sham," and was *designed* as such. Nor is such evidence mere good-character evidence, as the government's motion dismissively argues. Rather, it directly rebuts the allegation that the SpineFrontier consulting program was "designed" to be a "sham consulting program."

### The Evidence and Arguments the Government Seeks to Preclude Are Relevant Even Under the Motion's Flawed Description of the Alleged Conspiracy

Even if the conspiracy the government pursued were limited to Dr. Chin's understanding of the allegations when receiving the Superseding Indictment – which the government has refused

to confirm – the evidence and arguments that the government seeks to preclude would still be relevant, or at least could not be precluded at this stage. At this point, Dr. Chin and the Court have not yet had an opportunity to see how the government will attempt to prove its case, and how specific proffered defense evidence might be used to respond to the government's case. The government's effort to limit evidence and argument is particularly premature in light of the heightened *mens rea* element involved here.

Proving an AKS violation requires proving that defendants acted knowingly and willfully. *See* 42 U.S.C. § 1320a-7b(b)(2). In the context of the AKS specifically, that element requires proof that defendants *knew* that the specific actions they took were illegal. *See United States ex rel. Hart v. McKesson Corp.*, 96 F.4th 145, 157 (2d Cir. 2024), *cert. denied*, No. 23-1293, 2024 WL 4426646 (U.S. Oct. 7, 2024) ("[T]he defendant must act with knowledge that his conduct was unlawful."); *Pfizer, Inc. v. United States*, 42 F.4th 67 (2d Cir. 2022); *United States v. McClatchey*, 217 F.3d 823, 829 (10th Cir. 2000); *United States ex rel. Langer v. Zimmer Biomet Holdings, Inc.*, No. CV 21-11293, 2024 WL 3633536, at *5 (D. Mass. Aug. 2, 2024) ("To establish a knowing and willful violation, Relator's complaint must allege that Zimmer acted with knowledge that its conduct was unlawful.").

The AKS also imposes an additional requirement that the defendant intended through the conduct at issue to induce sales of products. Knowledge that sales might result, or even evidence that a defendant "'hoped or expected or believed that'" a purchase would result from the payment does not equate to an intention to induce a purchase. *United States v. Regeneron Pharms., Inc.*, No. CV 20-11217-FDS, 2020 WL 7130004, at *8 (D. Mass. Dec. 4, 2020) (*quoting McClatchey*, 217 F.3d at 834). Rather, to be illegal under the AKS, inducement of a purchase must be "the 'motivating factor'" for the remuneration. *Id.* (*quoting McClatchey*, 217 F.3d at 835 n.7); *see also*

*United States v. Teva Pharms. USA, Inc.*, 560 F. Supp. 3d 412, 420 (D. Mass. 2021) (holding that under AKS, "liability attaches only when the statements and actions of a [defendant] reveal an intent beyond a 'collateral hope or expectation,' such that it is clear that the remunerations were designed specifically to encourage claims to Medicare." (internal citation omitted) (*quoting McClatchey*, 217 F.3d at 835 n.7)).

Even if this case were ultimately limited to payments to three doctors, among the more than 150 surgeons who used SpineFrontier's products and dozens of consultants who participated in the SpineFrontier consulting program, proof that put the relatively small number of consulting arrangements on which the government would thus focus into the broader context of the SpineFrontier consulting program as a whole would offer a very different picture of Dr. Chin's intentions and mindset than the picture that the government hopes to suggest to the jury through misleading omissions. There is presumably a reason that the Superseding Indictment continues to include an allegation that the program was "designed" for bribes, as the government apparently used such allegations as part of an effort to satisfy the *mens rea* element of its charging burden as described in the above-cited caselaw. In short, a viable theory of the defense is that the charged payments were in exchange for genuine and valuable consulting work, with any ensuing business nothing more than a hope or expectation, rather than a purpose or motivating factor. A jury may be far less likely to view relatively small payments to a few surgeons on whom the government has chosen to focus, and with which Dr. Chin devoted an extremely limited amount of time, as suggesting a knowing and willful violation of law when those payments are viewed in the context of a much larger and overall legitimate, productive, and valuable consulting program. Inversely, a trial that focused inappropriately on only a very small portion of the consulting program's activities, cherry-picked by the government and stripped of their full context, could give the jury

a misimpression that Dr. Chin must have intended to violate the law and must have intended to induce purchases because nothing else existed that would show the motivating factor or actual purpose for the consulting program. Given the importance of the heightened *mens rea* requirement to the crimes charged, any risk of deceiving or confusing the jury in this way should not be permitted.

More specifically, Dr. Chin expects that the trial evidence (if not improperly cabined) would reveal, for example, that SpineFrontier carried industry-leading products, but remained a relatively early-stage company focused on innovation. The company valued real-world experience and feedback from surgeons as it continually attempted to improve its products and develop new ones. Thus, SpineFrontier adopted a strategy of using many consultants, in an effort to obtain evaluations, feedback, and input from many surgeons, doing many different surgeries over time, on many different patients and patient types. Dr. Chin would also expect to show that improvements actually occurred as a result of this business strategy. Because of the breadth of the net that SpineFrontier cast, some surgeons proved to be less valuable or less accurate in their timekeeping than others. The government apparently intends to focus on them, depicting a small number of surgeons as having provided minimal or little value, hoping that the jury, viewing such evidence out of context, will conclude that "bribery" is the only reasonable explanation for the payments they received. Without the evidence of legitimate consulting, a jury would lack the context by which to determine whether Dr. Chin was exposed to reasons to believe in the purpose as one of serving innovation and whether any resulting business was nothing more than a hope or expectation, rather than a purpose or motivating factor.

An alternative explanation of the three particular consultants' conduct than the one the government intends to offer is that some surgeons underperformed, or even violated their

agreements by failing to deliver meaningful consulting, or even by making dishonest submissions of consulting time. That explanation becomes far more plausible to the extent SpineFrontier's approach was to seek feedback from a broad network of doctors. Even if SpineFrontier's particular approach to obtaining feedback in this manner ultimately was not consistent with best practices, or inadvertently incentivized some surgeons to behave inappropriately by abusing the program, Dr. Chin cannot be convicted based on a flawed program or SpineFrontier's payment of consulting fees to particular doctors, unless he both *intended* to induce purchases through such payments and *knew* that he was violating the law in doing so. If only three of dozens of consultants breached their obligations, a jury could find that Dr. Chin could not have been expected to anticipate those three cheating the company out of consulting fees. The jury's ability to assess Dr. Chin's mindset with respect to the few transactions remaining at issue may well turn on its ability to put those transactions into the context of the consulting program as a whole.

The government has made clear that it intends to demonstrate that some surgeons billed for consulting time without actually delivering feedback, evaluations, or ideas, or by delivering work product that was not commensurate with the amount of consulting time they billed. If the jury were exposed to *only* those surgeons' involvement, in a way that suggested that the *only* consulting that was done could be characterized in that manner, and thus would have been obvious to Dr. Chin, it would be far easier, albeit incorrect, for the jury to conclude that the consulting payments must have served an improper and illegal purpose. In contrast, to the extent SpineFrontier was receiving substantial amounts of valuable feedback through its consulting program, from literally dozens of surgeons, that value from the program may have masked more problematic aspects of it, such as by making SpineFrontier's executives and other personnel too inattentive to or too slow to realize the lack of value being provided by three particular consultants. That explanation for how

problematic consulting arrangements might have happened without it ever coming to Dr. Chin's attention, much less without him having any intention to violate the law, contrasts with the government's theory that any problematic relationships reflected willful and knowing violations of the AKS. Yet if all the jury were to see were consulting arrangements on which the government wants to focus, that exculpatory explanation becomes nearly impossible to appreciate. In a case where intent and willfulness will necessarily play a central role, the government's effort to keep such information from the jury is not appropriate.

The government's motion fails to appreciate such relevance by dismissing evidence of legitimate consulting work as improper "character" evidence not permitted by Fed. R. Evid. 404(a). But "character" would not be the purpose or content of such evidence. To the extent Rule 404 applies at all, it would be Rule 404(b), not Rule 404(a), that would govern. While Rule 404(b) typically concerns other "bad acts" introduced for a purpose other than character, it can also apply to "good acts" offered for non-character purposes, such as motive, intent, and knowledge. For example, in *United States v. Hayes*, 219 F. App'x 114, 115-16 (3d Cir. 2007), the court found error, and reversed a conviction, based on the District Court's having precluded "testimony from non-conspirator regional managers that [defendant] never asked them to falsify tests; and testimony from non-conspirator senior managers that [defendant] never suggested that data falsification was acceptable," as well as "particular statements or 'directives' [defendant] allegedly made in meetings with subordinates that tended to negate his involvement in a conspiracy to fabricate test results." The Third Circuit explained that such "good acts" evidence, or so-called "reverse Rule 404(b)" evidence, is "admissible for a proper purpose such as motive, intent, absence of mistake, etc." *Id.* at 116. As "a rule of inclusion rather than exclusion," Rule 404(b) "favors admission of evidence of other acts if such evidence is relevant for *any* purpose other than to show a mere

propensity or disposition on the part of the defendant to commit the crime." *Id.* at *116-17 (emphasis added; quotation marks and editing omitted). The court concluded, in language equally applicable here:

> The issue here is not [defendant's] good character. Rather, it is his conduct. Evidence that he conducted himself in a manner that was consistent with [the company's] announced policy, and inconsistent with a conspiracy to fabricate test results, was clearly relevant to the charges he had to defend against.

*Id.* at 117; *see also United States v. Marlinga*, 457 F. Supp. 2d 769, 775 (E.D. Mich. 2006) (holding, in case involving charges alleging two particular instances of alleged bribery, that Rule 404(b) required the admission of "good" conduct in unrelated instances to the extent it "evidences Defendant's innocent state of mind and lack of criminal intent").

Accordingly, while this Court may set limits on the quantum of witnesses to avoid a cumulative showing, evidence of legitimate consulting is clearly relevant and admissible. At the very least, until specific proffered evidence of legitimate consulting can be assessed in the face of how the government attempts to prove knowing and willful violations of law and the scope of the conspiracy, the Court cannot rule categorically that evidence of legitimate consulting has no relevance.

### Conclusion

For the reasons set forth herein, Dr. Chin respectfully requests that the Court deny the government's motion *in limine*.

Respectfully submitted,

**KINGSLEY CHIN**

By his attorneys,

/s/ *Joshua L. Solomon*
Barry S. Pollack (BBO #642064)
Joshua L. Solomon (BBO #657761)
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, MA 02116
(617) 439-9800
bpollack@psdfirm.com
jsolomon@psdfirm.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that this document, filed on May 2, 2025, through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Joshua L. Solomon*