UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES<br><br>     v.<br><br>KINGSLEY R. CHIN,<br>     *Defendant*. | No. 1:21-cr-10256-IT |

**DEFENDANT CHIN'S TRIAL BRIEF**

Defendant Kingsley Chin respectfully submits this Trial Brief in advance of jury selection scheduled to begin on May 19, 2025.

**Preliminary Statement**

Through a series of rulings and retreats, the government has gutted its case from what it contended consisted of millions of dollars in payments to dozens of surgeon-consultants in violation of the Anti-Kickback Statute and laundered proceeds. Originally, the government accused Dr. Chin and a long list of indicted and unindicted co-conspirators of operating a sham consulting program designed to hide SpineFrontier as the source of alleged bribes, with no meaningful consulting services being performed. The Indictment included allegations that Dr. Chin and others designed IME to avoid Sunshine Act requirements that required SpineFrontier, as a medical device manufacturer, to disclose payments made to surgeon-consultants. In reality, SpineFrontier regularly made Sunshine Act disclosures in its name and made the disclosures of all the pertinent consulting payments at issue. In part because the requisite concealment was lacking, this Court dismissed all money laundering charges.

More recently, the government voluntarily dismissed all charges against SpineFrontier and several substantive counts against the remaining individual defendants. The government obtained

a Superseding Indictment reflecting all these dismissals and removing many other allegations, such as those about the use of IME to avoid the Sunshine Act disclosures. The Superseding Indictment contains a conspiracy count and three substantive counts. After being directed by the Court to identify the full list of unindicted co-conspirators, the government cut its prior list dramatically to the three consultants who are the subject of the remaining substantive counts, a distributor affiliated with one of them, and one former SpineFrontier employee. It dropped 14 other alleged unindicted co-conspirators from its list. All five remaining witnesses on its list of unindicted alleged co-conspirators faced liability, received deals from the government that require their cooperation, and changed their stories over time to help the government. Instead of the millions of dollars in payments at issue before, the government focuses on a couple hundred thousand dollars in consulting payments spread across five years and three consultants, without challenging the work and value from dozens of other consultants who provided millions of dollars in services to SpineFrontier during that time.

As described below, just as the original charges have been abandoned, the government will not meet its burden of proof at trial on the limited remaining charges.

## Background

Dr. Chin is a leading inventor in the field of spine surgery. His work and perspective have focused on massive innovation at SpineFrontier to solve problems surgeons and patients faced with spinal implant devices. He and SpineFrontier are associated with more than 70 patents. As witnesses are expected to explain, from the outset, Dr. Chin did not just seek a collection of patents, as some inventors do, but rather focused on developing the products with the patents to enhance patient care. As a result, the jury will hear about the development and registration of multiple products and patents through the years surrounding and during the time period at issue in the

Superseding Indictment. Consistent with these goals and achievements, the jury will learn how the consulting program contributed to this innovation. Simply put, Dr. Chin's purpose for involvement with the consulting program was to generate innovation and products that helped improve care for patients.

In the Superseding Indictment, the government alleges that, of the dozens of active consultants during the years at issue, three of them did not perform services of sufficient value to justify the payments they received. All three of them were contractually required to provide services for their submission of accurate time entries. All three of them made representations to SpineFrontier about their actual time providing services. All three of them initially informed the government that they provided the expected services. Over time, while facing threats of jail, a loss of medical licenses, and financial ruin, witnesses changed their stories. None of the witnesses can credibly say that Dr. Chin knew they overestimated their time or otherwise overbilled.

The government has built its case around (1) the few surgeon-consultants (Drs. Montone, Murray, and Atwater) who changed their stories in response to perceived threats and risks, now claiming that they billed for more time in services than they actually provided, (2) a desperate former SpineFrontier salesperson, Scott Autrey, who wanted to deflect blame for his aggressive sales efforts and convinced the government to give him immunity, and (3) a few scattered emails that reflect a potential link between the consulting program and sales. The government's fact witnesses are simply not credible and the documents show that Dr. Chin believed in the proper purpose for SpineFrontier's consulting program. To avoid calling nothing but unreliable witnesses, the government is seeking to label as fact witnesses a few expert witnesses from the Veterans Administration, CMS, and HHS, even though the government acknowledges that these witnesses know nothing specifically about SpineFrontier.

Despite unreliable fact witnesses and gutting more than 75% of the payments at issue when dismissing counts and obtaining a Superseding Indictment, the charges for trial still expressly allege that the defendants put in place and used a "sham" consulting "program." As discussed in Dr. Chin's motion for a bill of particulars, the government has declined to confirm that its conspiracy theory is limited to conspiring to make payments to the three surgeons who are the subjects of the Superseding Indictment's counts for violations of the AKS. Paragraph 23 of the Superseding Indictment, for example, charges that defendants are responsible for directing bribes to surgeons "pursuant to a sham consulting program." Paragraph 24 also refers to "SPINEFRONTIER's sham consulting program." In Paragraph 26, the Superseding Indictment alleges that Dr. Chin and Mr. Humad "designed" the consulting program for the purpose of making "bribes" to surgeons. In Paragraph 31(i), the Indictment alleges the creation of records and documents, "including purportedly legitimate contracts, designed to make the sham consulting program appear legitimate." The Indictment also impugns the entirety of the consulting program by alleging that Impartial Medical Experts, LLC, the entity through which *all* consulting payments were made after a particular period, not just payments to alleged co-conspirators, "*purported* to manage the process pursuant to which SPINEFRONTIER's surgeons submitted hours and received payments from or on behalf of SPINEFRONTIER for *purported* consulting." (Indictment ¶ 4 (emphases added).)

In the context of an allegedly "sham" consulting program and allegations of willfulness, the Superseding Indictment places at issue whether Dr. Chin interacted with SpineFrontier's consulting program with a bad purpose to violate the law, a proper purpose to innovate for the benefit of patients, or some other innocent purpose. The pertinent provisions of the Anti-Kickback Statute invoked in the remaining three substantive counts in the Indictment provide:

4

> Whoever **knowingly and willfully** offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person **to induce such person**—
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

42 U.S.C. § 1320a–7b(b)(2) (emphases added). The Superseding Indictment also charges a conspiracy, placing at issue whether Dr. Chin and his alleged co-conspirators shared a common unlawful purpose and corrupt intent to conspire through a "sham" consulting program, in violation of 18 U.S.C. § 371.

Evidence at trial will show that the remnants of vague allegations in the Superseding Indictment about a "sham" consulting program and "purported" consulting services ignore reality. The evidence will show that, from Dr. Chin's perspective, consulting payments served the purposes of innovation, product development, and patient care. The government cannot show a "purpose" of payments to consultants was generating sales to those consultants. Under the law, as described below, it is not enough for Dr. Chin or others to have hoped or expected, or even believed, that sales would occur. As described below, hopes, expectations, and beliefs do not rise to the level of a "purpose" under the Anti-Kickback Statute. Similarly, the government will fail to show at trial that Dr. Chin acted willfully, which in the context of the AKS requires a showing that he *knew* he was violating the law. Indeed, the achievements at SpineFrontier and related businesses informed Dr. Chin's purposes, as the consulting program promoted innovation, product development, and patient care, far from the "sham" that the Superseding Indictment expressly alleges. There is simply no basis for inferring or concluding that, with the backdrop of innovation, product

development, and improvements to patient care, Dr. Chin thought any aspect of the consulting program was unlawful, as the government must prove to avoid an acquittal on all charges.

## Discussion

I. **The *Mens Rea* Requirements for the Charged Offenses Places the Burden on the Government to Show, Among other Things, that (1) a Motivating Factor Rising to a Purpose, Rather than a Hope, Expectation, or Belief, that Consulting Payments Would Generate Purchases by Consultants, and (2) Dr. Chin Knew that His Conduct was Unlawful.**

The government cannot overcome the overwhelming evidence of Dr. Chin's motivation and driving purposes to innovate, develop products, and improve patient care, in part through the SpineFrontier consulting program and otherwise. Proving a violation of the Anti-Kickback Statute requires proof beyond a reasonable doubt that defendants acted knowingly and willfully. *See* 42 U.S.C. § 1320a-7b(b)(2). Willfulness is to be determined based on "all the surrounding circumstances." *Rutkin v. United States*, 343 U.S. 130, 135 (1952); *see United States v. Mena,* 933 F.2d 19, 25 n.5 (1st Cir. 1991) (allowing evidence of after-the-fact acts as having "obvious evidentiary significance in establishing what happened during" the event at issue because a defendant's intent can be inferred "in light of all the surrounding circumstances" (citation omitted)); *United States v. Johnstone*, 107 F.3d 200, 209 (3d Cir. 1997) ("Knowledge and intent may be inferred from all the surrounding circumstances … [including] all the natural and probable consequences of an act knowingly done.").

In the context of the Anti-Kickback Statute specifically, the *mens rea* element requires proof that the defendants *knew* that the specific actions they took were illegal. *See United States ex rel. Hart v. McKesson Corp.*, 96 F.4th 145, 157 (2d Cir. 2024), *cert. denied*, No. 23-1293, 2024 WL 4426646 (U.S. Oct. 7, 2024) ("[T]he defendant must act with knowledge that his conduct was unlawful." (internal quotation marks omitted)); *Pfizer, Inc. v. United States*, 42 F.4th 67, 77 (2d Cir. 2022); *United States v. McClatchey*, 217 F.3d 823, 829 (10th Cir. 2000); *United States ex rel.*

*Langer v. Zimmer Biomet Holdings, Inc.*, 743 F. Supp. 3d 282, 292 (D. Mass. 2024) ("To establish a knowing and willful violation, Relator's complaint must allege that Zimmer acted with knowledge that its conduct was unlawful.").

The AKS also imposes the requirement that the defendant intended through the conduct at issue to induce sales of products. Knowledge that sales might result, or even evidence that a defendant "'hoped or expected or believed that'" a purchase would result from the payment does not equate to an intention to induce a purchase. *United States v. Regeneron Pharms., Inc.*, No. CV 20-11217-FDS, 2020 WL 7130004, at *8 (D. Mass. Dec. 4, 2020) (*quoting United States v. McClatchey*, 217 F.3d 823, 834 (10th Cir. 2000)). Rather, to be illegal under the Anti-Kickback Statute, inducement of a purchase must be "the 'motivating factor'" for the remuneration. *Id.* (*quoting McClatchey*, 217 F.3d at 835 n.7); *see also United States v. Teva Pharms. USA, Inc.*, 560 F. Supp. 3d 412, 420 (D. Mass. 2021) (holding that under AKS, "liability attaches only when the statements and actions of a [defendant] reveal an intent beyond a 'collateral hope or expectation,' such that it is clear that the remunerations were designed specifically to encourage claims to Medicare." (internal citation omitted) (*quoting McClatchey*, 217 F.3d at 835 n.7)).

The Superseding Indictment alleges that the consulting program was a "sham" and "designed" for bribes. These express allegations of willfulness and conspiratorial intent relate to the *mens rea* elements. Potential defense strategies focus on knowledge and intent here, including through a look at the limited amount of consulting payments at issue compared to the value of benefits and improvements in the innovation of products and patient care. At trial, Dr. Chin expects to show the jury that *his* purposes for getting involved with the consulting program was to obtain feedback from consultants to promote innovation, product development, and improvements in patient care. Furthermore, to the extent SpineFrontier was receiving substantial amounts of

7

valuable feedback through its consulting program, from literally dozens of surgeons, that value from the program may have masked more problematic aspects of it such as by making SpineFrontier's executives and other personnel too slow to realize the lack of value being provided by three particular consultants on whom the government is now focused. That explanation for how problematic consulting arrangements might have happened in a few instances, *without it ever coming to Dr. Chin's attention*, much less without him having any intention to violate the law, contrasts with the government's theory that any problematic relationships necessarily reflected willful and knowing violations of the AKS.

Under these circumstances, Dr. Chin should be permitted broad latitude to show his purposes for involvement with the consulting program and his good faith. The government has attempted to limit Dr. Chin's ability to defend himself this way, citing cases that do not support the government's efforts to do so. The government has relied, for instance, on *United States v. Bay State Ambulance & Hospital Rental Service, Inc*., 874 F.2d 20 (1st Cir. 1989), in which the court addressed a Medicare fraud provision and assessed whether a jury instruction that expressly required the government to prove "corrupt intent" sufficed without giving an instruction, which the defense had requested, stating that the reasonableness of payments could provide a defense. Contrary to the government's approach in the present motion, the First Circuit ruled that "the circumstances surrounding the conduct and statements were relevant." *Id.* at 33. As in *Bay State Ambulance*, *mens rea* for a specific-intent offense is at issue here. There the court reasoned that the jury found the defendant "not guilty on all but one check payment," which reflected that it "could have believed that the check payments were compensation for work done with only an incidental improper purpose" and therefore acquitted on those charges, while finding the delivery of two cars to have an improper purpose. *Id.* at 30. In other words, by focusing on how surrounding

8

circumstances reflected genuine value, the *Bay State Ambulance* decision supports Dr. Chin's efforts to show his good faith and proper purposes.

Other case law on which the government has relied is equally unhelpful to its position. The government has cited, for another example, to this Court's decision in *United States ex rel. Bawduniak v. Biogen Idec, Inc.*, No. 12-CV-10601-IT, 2018 WL 1996829 (D. Mass. Apr. 27, 2018). In *Biogen Idec*, the Court addressed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) and found that a relator need not allege that a specific *quid pro quo* "changed prescribing habits" in exchange for a payment. *Id.* at *3. Nothing in this Court's *Biogen Idec* decision remotely addressed the scope of evidence with which a defendant can attack express accusations or the credibility of witnesses, or how a defendant can rebut proof of *mens rea* or conspiratorial intent to induce purchases. Indeed, exposure to good results from consulting payments would be a fact from which a jury could infer that a defendant acted with proper purposes and lacked the requisite *mens rea* that the government must establish as criminal, including either a willful violation of the AKS or a conspiratorial intent to commit such an unlawful act.

The government has also relied on another civil case, *United States ex rel. Witkin v. Medtronic, Inc.*, No. 1:11-CV-10790-IT, 2024 WL 1892405, at *15 (D. Mass. Mar. 31, 2024), which arose in the context of summary judgment standards. In *Medtronic*, this Court explained the right of even civil defendants to present expert testimony and surrounding circumstances to impeach the credibility of witnesses and establish the fair value of payments, which could also bear on willfulness and conspiratorial intent issues here:

> To the extent Medtronic attempts to question McNamara's credibility generally and offers an expert who reaches a different conclusion, that is a determination for the trier of fact, not the court. "So long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities." *Milward v. Acuity Specialty Prod. Grp., Inc.*,

9

> 639 F.3d 11, 15 (1st Cir. 2011) (internal quotation marks and citation omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id*. (quoting *Daubert v. Merrell Dow. Pharm., Inc*., 509 U.S. 579, 596 (1993)). Thus, because resolution of this fair-market-value dispute would require the court to choose between the well-grounded opinions of competing experts, summary judgment is inappropriate on the issue.

*Id.* at *15.

The government has also relied on *Pfizer, Inc v. United States Department of Health & Human Services*, 42 F.4th 67 (2d Cir. 2022), in which Pfizer challenged an advisory opinion issued by the Department of Health and Human Services prior to the deregulatory impact of *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). As in the *Biogen Idec* case, nothing in *Pfizer* remotely addresses the admissibility of evidence concerning surrounding circumstances as part of defending against criminal charges that require proof of heightened *mens rea* and conspiratorial intent to achieve an unlawful purpose. Indeed, the *Pfizer* decision reaffirms that substantive offenses under the Anti-Kickback Statute contain essential elements of specific intent for a *quid pro quo*. *Pfizer, Inc.*, 42 F.4th at 72, 79 (holding that, under the Anti-Kickback Statute, one factor cutting against "[o]vercriminalization" is the requirement that "a person must 'knowingly and willfully' provide prohibited remuneration to be liable, which means she must have offered the payment with the intent to violate a known legal duty"). The same problems arise with the government's invocation of *Pharmaceutical Coalition for Patient Access v. United States*, 126 F.4th 947, 962 (4th Cir. 2025), which involved a challenge to HHS's advisory opinion, again without remotely addressing evidentiary issues concerning a criminal defendant's right to challenge express accusations in an indictment or to attack the credibility of witnesses, or to rebut evidence of *mens rea* for the substantive offense or the corrupt intent of a conspiratorial agreement.

The criminal cases from other circuits on which the government relies also provide no help to its position. In *United States v. Patel*, 778 F.3d 607 (7th Cir. 2015), the court merely addressed the sufficiency of evidence to support a conviction, not the scope of admissible evidence with which a defendant can show his good faith and proper purposes, rather than an improper purpose or intent to commit an unlawful act. *Id.* at 619 (focusing on whether a "reasonable factfinder could conclude that Patel 'willfully and knowingly' received a kickback"). In another decision on which the government relies that addressed a pertinent evidentiary ruling, the court merely prevented a trial within a trial concerning medical necessity, while allowing evidence about helping patients and the absence of any request that a provider do anything improper. *See United States v. Eggleston*, 823 F. App'x 340, 343 (6th Cir. 2020). In fact, the *Eggleston* court held that a defendant could resort to evidence of good treatment for "any other reason" than to argue medical necessity. *Id.* ("Eggleston's cross-examinations of [government witnesses included … h]er attorney ask[ing] about the treatment [patient] Hodge received and whether it helped her [and] Hodge confirmed that it did help," and patient "Jones was likewise asked about his treatment and whether Eggleston ever asked him to do anything improper [and] Jones confirmed that Eggleston did not") (citations to record omitted)).

Under these circumstances, the jury should be entitled to hear from Dr. Chin's defense about all the surrounding circumstances that show his proper purposes and good faith.

## II. The Government's Witnesses Consist of Individuals Who are Either Compromised by Their Conduct and Deals with the Government, or Who Lack Personal Knowledge About Dr. Chin's Role.

The government has reduced its witness list to a small number of cooperating witnesses and a few expert witnesses from the Veterans Administration, CMS, and HHS, who admit knowing

11

nothing about SpineFrontier, but whom the government still tries to label as fact witnesses. This Court should properly instruct the jury about its need to use greater care and caution when considering testimony by cooperating witnesses. Also, this Court should preclude the government from calling late-disclosed expert witnesses who know nothing about SpineFrontier, but are being called largely to conceal the government's reliance on nothing but unreliable witnesses.

With respect to the cooperating witnesses, the government has attempted in proposed instructions to dilute the requisite admonition to the jury that it must use greater care and caution when considering their testimony. As approved in a recent court decision, in *United States v. Deleon*, No. CR 07-10277-NMG, 2016 WL 3747487, at *12 & n. 12 (D. Mass. May 9, 2016), *report and recommendation adopted*, No. 07-10277-NMG, 2016 WL 3766289 (D. Mass. May 9, 2016), the "greater care and caution" instruction should state:

> Now, the testimony of a witness who has testified pursuant to a plea and/or cooperation agreement with the government must be examined and considered with greater care and caution than the testimony of an ordinary witness. You should bear in mind that a witness who has entered into such an agreement has an interest in this case different than an ordinary witness. A witness who realizes that he may be able to obtain his freedom or receive a lighter sentence or obtain other benefits from the government by giving testimony favorable to the prosecution has a motive to testify falsely. Therefore, you must examine the testimony with greater care and caution. You may consider whether the testimony was affected by interest or prejudice, personal gain or expectation of personal gain or expectation of favorable sentencing recommendations by the government. In addition, the fact that one or more of the witnesses pled guilty to an offense is not evidence that the defendant in this case is guilty, and it cannot be considered by you in any way as evidence against the defendant.

*Id.*

As described in Dr. Chin's motion *in limine* to preclude the government's belated resort to representatives of CMS as witnesses, the government is attempting to call witnesses who it admits know nothing about SpineFrontier (or Dr. Chin). Recently, the government expanded this effort to witnesses from the Veterans Administration and HHS. In part, past disclosures have reflected the

12

government's intention to rely on such witnesses on issues of law, which is uniquely the Court's province. *See Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 100 (1st Cir. 1997) (explaining that expert witnesses cannot testify to legal conclusions "because the judge's expert knowledge of the law makes any such assistance at best cumulative, and at worst prejudicial"). Second, apparently the government resorted to such witnesses to review documents in this case and then offer views on what they mean and what CMS's views would be in light of Medicare practices, such as on issues of materiality, which is also not allowed. *See United States v. Vista Hospice Care, Inc.*, No. 3:07-CV-00604-M, 2016 WL 3449833, at *15 (N.D. Tex. June 20, 2016). Here, the government has made no disclosure of anything more appropriate for the government agency representatives it seeks to label as fact witnesses, but use as expert witnesses.

In *Vista Hospice Care*, the court stated: "Insofar as Dr. Steinberg summarized documents and testimony regarding Defendants' marketing and business practices and then opined on how those practices impacted Defendants' employees and the physicians who certified patients for hospice, such testimony is based on improper speculation, which the Court would not allow at trial, and thus the Court will not consider it." *Id.* In more detail, the court explained:

> Further, "characterizations of documentary evidence" are not proper subjects for expert testimony, "because the trier of fact is entirely capable of determining whether or not to draw such conclusions without any technical assistance from...experts." *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). A large section of Dr. Steinberg's report summarizes and describes documents produced by Defendants in the course of this litigation. *See, e.g.*, Steinberg Rept. at 28 ("It is clear from VistaCare's documents that they had a formal, company-wide policy to have their Medical Review Team review all potential live discharges due to medical ineligibility."); *id.* at 31 ("Based on the documents and witness testimony I have reviewed, VistaCare appears to have put immense pressure on its employees to maintain census."). These summaries and characterizations would not be helpful to jurors, who are able [to] make their own determinations about what relevant documents show, and such testimony therefore would not be allowed, and will not be considered here.

13

*Id.* Likewise, here the government elicited from a CMS witness at his "interview" opinions concerning the legal reach of the Anti-Kickback Statute, CMS's views, and other unsubstantiated or speculative commentary or characterizations about the facts. In its role as gatekeeper, this Court should preclude the government from relying on government agency representatives who may boast, as the previously disclosed CMS representative did in his CV, of abilities to "convince" factfinders, which the real fact witnesses here cannot do because of their changing stories and cooperation and immunity deals.

Simply put, with proper boundaries, the government lacks a credible fact witness for trial

**Conclusion**

Based on the foregoing, Dr. Chin respectfully submits that, at trial, he should be permitted to show all surrounding circumstance that show his proper purposes and good faith, while the Court limits the government to witnesses with actual personal knowledge concerning fact disputes at issue and instruct the jury about the need to use greater care and caution when considering the government's fact witnesses.

Respectfully submitted,

**KINGSLEY CHIN**

By his attorneys,

/s/ *Joshua L. Solomon*
Barry S. Pollack (BBO #642064)
Joshua L. Solomon (BBO #657761)
POLLACK SOLOMON DUFFY LLP
31 St. James Avenue, Suite 940
Boston, MA 02116
(617) 439-9800
bpollack@psdfirm.com
jsolomon@psdfirm.com

## CERTIFICATE OF SERVICE

      The undersigned certifies that this document, filed on May 2, 2025, through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

                                                  */s/ Joshua L. Solomon*